The defendants, husband and wife, were convicted in the district court of Covington County for violating Code of Alabama 1975, Section 12-15-13, by refusing to comply with Alabama's compulsory school attendance laws. Appeal to this court is upon the following stipulation of facts as authorized by Section 12-12-72.
 "The Defendants, Charles and Ann Jernigan, were convicted in the Juvenile Court of Covington County, Alabama, of violating Section 12-15-13, Code of Alabama, 1975, (causing delinquency, dependency, or need of supervision of a child) based on their failure to send their children under the age of 16 to school in compliance with the Alabama Compulsory School Attendance Law, Section 16-28-1, et. seq., Code.
 "The Defendants are practicing Catholics who belong to a Catholic Order called the Society of St. Pius X. The educational doctrines of their Order are based on the traditional Catholic position that the education of children is the primary responsibility of the parents, and that the children should be brought up in a Catholic educational environment. Based on their religious convictions, the Jernigans refused to send their children to the local public school on the grounds that to do so would violate traditional Catholic prohibitions against secular education and would expose their children to non-religious educational influences. The Jernigans testified that they believed that if parents allow their children to be exposed to such secular education or influences, then the parents will have committed a mortal sin if the religious salvation of the children is thereby endangered.
 "There is no parochial school in Covington County. The nearest parochial school would be in Montgomery or Dothan.
 "For the past year the Jernigans have been educating their children at home using a Catholic correspondence course. The Defendants testified that their children adhere to a regular schedule of *Page 1244 
study between the hours of 8:00 A.M. and 4:00 P.M. for more than three hours each day and for at least 140 days each calendar year. Mrs. Jernigan instructs her children in the English language but because she does not hold a State teacher's license, she is unable to qualify under the existing law as a `private tutor.' Mrs. Jernigan made several attempts to have the course under which she is instructing her children approved as a substitute for public or parochial school attendance, but was informed by the State Superintendent of Education that this is not permitted under present regulations. Mrs. Jernigan has a high school diploma, but does not have a college degree or formal educational training, so she could not qualify for a state teacher's certificate which would allow her to meet the `private tutor' provisions of the compulsory attendance law.
 "The State obtained a conviction based on a prima facie showing that the children were not attending public school or an approved substitute and after the Defendants had been given written notice as provided for under Alabama law."
The defendants contend that their convictions cannot stand in light of the doctrines postulated in Wisconsin v. Yoder,406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Basically, they argue that the state must permit them to educate their children at home as an incident of their right to freedom of religion as protected under the constitutions of the United States and the State of Alabama.
In Yoder, members of the Amish religion objected to the Wisconsin compulsory education law insofar as it required them to cause their children to attend school past the eighth grade. They believed, in accordance with the well established tenets of the Old Order Amish religion, that sending their children to public high school would endanger the salvation of both the parents and their children. This danger lay in the strongly held and time honored central belief of the Amish faith that salvation requires life in a church community totally separate and apart from the outside world and its influence.
In reversing the convictions of the Amish parents in Yoder, the United States Supreme Court employed a balancing test.
 "The court weighed the concededly valid interest of the state in imposing reasonable regulations for the control and duration of basic education against the fundamental rights asserted by the Amish to freely exercise their religion and to direct their children's religious upbringing. The court concluded that the Amish parents had convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Amish communities, the hazards of enforcing the compulsory education law against them, and the adequacy of the informal vocational education provided Amish youth past the eighth grade. The court held that the state had failed to show how, on balance, its legitimate interests in assuring an educated, self-reliant and self-sufficient populace justified requiring Amish children to attend school for a period of up to two additional years in contravention of their religious beliefs."
 State ex rel. Nagle v. Olin, 64 Ohio St.2d 341, 415 N.E.2d 279, 285 (1980).
The court found that the Amish proved that their way of life was inextricable from their religious beliefs and noted that the Amish religion pervades and determines the entire mode of life of its adherents. Sending the Amish children to high school would contravene and endanger the entire way of life mandated by the Amish religion. Because Amish children are assimilated into an agrarian society removed from other worldly influences, the values, goals and attitudes of modern secondary education were found to be in sharp conflict with the fundamental mode of life mandated by the Amish religion, to substantially interfere with the religious development of the Amish child and his integration into the Amish faith community and to carry with it the very *Page 1245 
real threat of undermining the Amish community and religious practice as it currently existed. The Supreme Court held that the state's interests in compulsory education for children to age 16, while important, were not sufficiently supported as applied to the established religious groups of the Old Amish Order and the Mennonites to outweigh the First Amendment free exercise of religion right with which the "brief additional period of formal education" was found to interfere. Yoder, supra; Hanson v. Cushman, 490 F. Supp. 109 (W.D.Mich. 1980).
While the sincerity of the defendants' beliefs is not questioned, the other facts of this case are significantly different from those in Yoder. In Yoder, the parents sought only to have their children exempted from compulsory attendance after completion of the eighth grade. The Amish did not object to elementary education through the first eight grades because "it does not significantly expose their children to worldly values or interfere with their development in the Amish community during the crucial adolescent period." Yoder,406 U.S. at 212, 92 S.Ct. at 1531. Here the defendants claim the right to educate their children through a program of home study free from the compliance with state education laws.
The concurring opinion of Mr. Justice White, in which Mr. Justice Brennan and Mr. Justice Stewart joined, emphasized that the small increment of additional schooling involved in Yoder
was, for him, decisive:
 "This would be a very different case for me if respondent's claim were that their religion forbade (the) children from attending any school at any time and from complying in any way with the educational standards set by the State."
 Yoder, 406 U.S. at 238, 92 S.Ct. at 1544 (White, J., concurring).
In Yoder the court found that the additional one or two years of formal high school education (beyond the eighth grade until the child is 16) for Amish children "would do little" to serve the interests of the state in preparing citizens to participate effectively and intelligently in the political system. Yoder,406 U.S. at 221, 92 S.Ct. at 1536. The court noted that the informal vocational education provided by the Amish was highly successful in preparing the child for life in the separated agrarian community that is the keystone of the Amish faith.
Here the defendants seek to exempt their children from all public education without any showing that the home education they practice is an adequate substitute or replacement. The stipulation of facts upon which this appeal is submitted does not include any indication of Mrs. Jernigan's competence or ability to teach her own children other than the bare fact that she has a high school diploma. Unlike the Amish parents inYoder, the defendants have not demonstrated that their home teachings are successful in preparing their children for life in modern society. There is not even a contention made that the children are being prepared for anything other than life in society as the majority live.[1]
Unlike the Amish in Yoder, the defendants have not shown that their entire way of life is inextricable from their religious beliefs or that public schooling would substantially interfere with their religious practices. Neither have the defendants demonstrated that they can replace the positive aspects of compulsory education through the manner in which they insist upon educating their children.
The defendants have not demonstrated that compulsory education will tend to harm their children's salvation. The facts stipulated were that the defendants believe that "if
parents allow their children to be exposed to such secular education or influences, then the parents will have committed *Page 1246 
a mortal sin if the religious salvation of the children is thereby endangered." (emphasis added) Yet the defendants fail to show that a secular education conflicts with or endangers the religious values or beliefs or salvation of the children. This is in stark contrast to the conclusion of the court inYoder.
 "The conclusion is inescapable that secondary schooling, by exposing Amish children to worldly influences in terms of attitudes, goals, and values contrary to beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child.
 "The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."
* * * * * *
 "In sum, the unchallenged testimony of acknowledged experts in education and religious history, almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondent's religious beliefs."
Yoder, 406 U.S. at 218-9, 92 S.Ct. at 1534-5.
"There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education." Yoder, 406 U.S. at 213, 92 S.Ct. at 1532; Pierce v.Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070
(1925). Even though the providing of public schools ranks at "the very apex of the function of a State", Yoder, supra, this paramount responsibility is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of Pierce, "prepare (them) for additional obligations." Pierce, 268 U.S. at 535,45 S.Ct. at 573.
Balancing the interest of the State against the religious interests asserted by the defendants, we find that the Alabama Compulsory School Attendance Law as applied to the defendants does not violate any constitutional right of freedom of religion. Hill v. State, 381 So.2d 91 (Ala.Cr.App. 1979), reversed on other grounds, 381 So.2d 94 (Ala. 1980).
The defendants also argue that their liberty, privacy and family integrity are violated by that portion of the compulsory school law requiring private tutors to hold public teaching certificates. A state's power to require basic education of its citizens in order to promote legitimate State interests is undisputedly recognized. Yoder, supra. Having a high responsibility for the education of its citizens, a state has the power to impose reasonable regulations for the control and duration of basic education. Yoder. The State of Alabama does not seek, as did the State of Oregon in Pierce, supra, to compel children to receive instruction from public schools or public school teachers only. And as Pierce pointed out,
 "No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." *Page 1247 
Pierce v. State, supra.
And although Pierce does stand "as a charter of the rights of parents to determine the religious upbringing of their children", Yoder recognizes that this power of the parent may be limited by the State. We find no merit in defendant's contention. As the court stated in Meyer v. Nebraska,262 U.S. 390, 67 L.Ed. 1042, 43 S.Ct. 626 (1923): "Practically, education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto." We find this statement to be equally true for children who must receive their education in the home and an ample justification for the State's reasonably narrow requirement of board certification for public and non-public school teachers. And as we have indicated, the defendants have not demonstrated that they can and will continue to provide an equivalent education, and it is not incumbent upon the State to verify the same.
We find that the holding of Roe v. Connecticut, 417 F. Supp. 769
(M.D.Ala. 1976), relied upon by the defendants, is inapplicable to the instant case. The requirements of the compulsory attendance law, as applied to these defendants, are narrowly and reasonably drawn and directed toward furthering a compelling State interest. There is no unreasonable unconstitutional interference with the right to family integrity in its requirements. The compulsory attendance law does not "sweep past the constitutionally permissible range of interference into the sanctity of the family unit." Roe,417 F. Supp. at 779.
We believe we have answered the defendants' various other constitutional contentions in the foregoing parts of this opinion. We do not find that the statutory requirements are overbroad or unduly restrictive in purpose or effect as applied to these defendants. State ex rel. Nagle v. Olin, 64 Ohio St.2d 341, 415 N.E.2d 279 (1980); State v. Whisner, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976). We do find the State's interest in compulsory education is both legitimate and compelling after balancing the facts of this case. Hanson v. Cushman,490 F. Supp. 109, 115 (W.D.Mich. 1980).
We have reviewed the record in light of all the contentions raised and find no harm to the substantial rights of the defendants. The judgment of the Circuit Court is affirmed.
AFFIRMED.
All Judges concur.
[1] "(T)he value of all education must be assessed in terms of its capacity to prepare the child for life. It is one thing to say that compulsory education for a year or two beyond the eighth grade may be necessary when its goal is the preparation of the child for life in modern society as the majority live, but it is quite another if the goal of education be viewed as the preparation of the child for life in the separated agrarian community that is the keystone of the Amish faith."
Yoder, 406 U.S. at 222, 92 S.Ct. at 1536.