885 F.2d 940
 58 USLW 2198, 56 Ed. Law Rep. 82
 NEW LIFE BAPTIST CHURCH ACADEMY, et al., Plaintiffs, Appellees,
v.
TOWN OF EAST LONGMEADOW, et al., Defendants, Appellees.
Appeal of COMMONWEALTH of MASSACHUSETTS, Intervenor.
NEW LIFE BAPTIST CHURCH ACADEMY, et al., Plaintiffs, Appellees,
v.
TOWN OF EAST LONGMEADOW, et al., Defendants, Appellants.
 Nos. 88-1610, 88-1673, 88-1611 and 88-1612.
 United States Court of Appeals,
First Circuit.
 Heard Feb. 8, 1989.
Decided Sept. 7, 1989.
Rehearing and Rehearing En Banc Denied Oct. 13, 1989.
 
 Janet Steckel Lundberg with whom Richard Friedman, Susan A. Benz and Krokidas & Bluestein were on brief for defendants.
 Robert H. Blumenthal, Sp. Asst. Atty. Gen., Dept. of Educ., for intervenor.
 Peter J. Brann, Asst. Atty. Gen., and James E. Tierney, Atty. Gen., on brief for the State of Me., amicus curiae.
 Richard G. Gay with whom Law Office of Richard G. Gay was on brief for plaintiffs, appellees.
 Christopher J. Klicka and Michael P. Farris on brief for Home School Legal Defense Ass'n, amicus curiae.
 Sarah Barringer Gordon, Fine, Kaplan and Black, Michael J. Woodruff, Michael Stokes Paulsen, Center for Law and Religious Freedom, Hon. Arlin M. Adams and Schnader, Harrison, Segal & Lewis on brief for Christian Legal Soc., Ass'n of Christian Schools Intern., Southern Baptist Convention, and Nat. Ass'n of Evangelicals, amici curiae.
 Wendell R. Bird, David J. Myers and Law Offices of Wendell R. Bird on brief for American Ass'n of Christian Schools and Christian Legal Defense & Educ. Foundation, amici curiae.
 Before BREYER, ALDRICH and SELYA, Circuit Judges.
 BREYER, Circuit Judge.
 
 
 1
 This case raises questions about the extent to which the First Amendment permits a religious group to refuse to comply with state rules and procedures for determining the adequacy of the secular education that the religious group provides to children. The present controversy arises because a child cannot satisfy Massachusetts' compulsory school attendance laws by attending a private school unless the local school committee "approves" the education that the private school provides. Mass.Gen.L. ch. 76, Sec. 1. A school committee must "approve" the private school when the school meets certain minimal statutory criteria and also offers a secular education comparable to that provided in the town's public schools. The New Life Baptist Church Academy, together with several of its members and related persons (the plaintiffs, whom we shall collectively call the "Academy"), believe that it is a sin to "submit" their educational enterprise to a secular authority for approval. The Academy claims that the First Amendment therefore forbids the School Committee of the Town of East Longmeadow, Massachusetts (the "School Committee") to "approve" the school, particularly if the School Committee, in doing so, follows its proposed procedures for evaluating the school, procedures which essentially consist of gathering written information from the Academy, reviewing the academic credentials of the Academy's teachers, and visiting the school once (or, in the absence of adequate teacher credentials, more than once) to observe the quality of the teaching. In the Academy's view, those proposed procedures unnecessarily burden the free exercise of religion when compared with the Academy's preferred alternative, an approach that depends upon standardized pupil testing. The Academy brought this law suit to prevent the School Committee from carrying out its proposed approval process.
 
 
 2
 The district court held evidentiary hearings. It examined the School Committee's proposed procedures. It also heard evidence about how one might administer standardized tests each year to the Academy's pupils. It concluded that the School Committee's proposed approval procedures unnecessarily burden religion, given what it saw as the less burdensome possibility of "standardized testing." And, it held the School Committee's proposed evaluation methods unconstitutional, as violating both the "free exercise" and "establishment" clauses of the First Amendment. See New Life Baptist Church Academy v. Town of East Longmeadow, 666 F.Supp. 293 (D.Mass.1987) ("New Life ").
 
 
 3
 The School Committee (joined by the Commonwealth of Massachusetts as intervenor) appeals. We have reviewed the record, keeping in mind that "First Amendment questions of 'constitutional fact' compel [the] Court's de novo review." Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 54, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296 (1971) (plurality opinion) (citations omitted). See Miller v. Fenton, 474 U.S. 104, 113-15, 106 S.Ct. 445, 451-52, 88 L.Ed.2d 405 (1985) (surveying law of constitutional facts); Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) ("in cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' " to determine the constitutional importance of the facts of the case) (citation omitted). We conclude that standardized testing does not offer an alternative that so better serves the relevant constitutional interests that the First Amendment requires its adoption. Consequently, the School Committee's efforts to evaluate and to "approve" the Academy, as now set forth (prior to implementation), do not violate the federal Constitution.
 
 I.
 Background
 
 4
 A. State law. Massachusetts state law requires nearly all children to attend school. Mass.Gen.L. ch. 76, Sec. 1. They may attend a "public day school ... or some other day school;" but any "other day school" (i.e., private school, whether secular or parochial) must be "approved by the school committee" of the town in which the school is located. Id. The school committee must
 
 
 5
 approve a private school when satisfied that the instruction in all the studies required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town; but shall not withhold such approval on account of religious teaching.
 
 
 6
 Id. The "studies required by law" include orthography, reading, writing, the English language and grammar, geography, arithmetic, drawing, music, the history and Constitution of the United States, the duties of citizenship, health education, physical education, and good behavior. Mass.Gen.L. ch. 71, Sec. 1. If children between the ages set by the state Department of Education do not attend a public school or an "approved" private school (or receive official permission to work or to be educated in some other setting), the state may prosecute their parents under Mass.Gen.L. ch. 76, Sec. 2; and any person (including a town) may initiate a civil proceeding under Mass.Gen.L. ch. 119, Sec. 24, to compel education for the children or even to remove the children from their parents.
 
 
 7
 B. The School Committee's proposal. The School Committee, complying with the statute, intends to evaluate, and then to approve or disapprove, the Academy's secular education. The Committee has developed a set of procedures to help it decide whether or not to approve a private school such as the Academy. It has modified those procedures somewhat in an effort to accommodate the Academy's religious beliefs. The record indicates that, at present, the School Committee would like to do the following:
 
 
 8
 (a) obtain information about the school's pupils, texts, daily class schedules, hours and days taught, compliance with health and safety rules, and curricula for each grade and subject, New Life, 666 F.Supp. at 300;
 
 
 9
 (b) examine the academic qualifications of faculty members, id.;
 
 
 10
 (c) visit the school once, to meet with the administrator and to obtain a first-hand impression of teaching methods, instructional materials, and curricula, id.;
 
 
 11
 (d) if the teachers lack adequate academic credentials, visit the school additional times to observe classroom teaching, id.;
 
 
 12
 (e) make suggestions for correcting deficiencies in the school's educational program (if any), id.
 
 
 13
 After taking these steps, the School Committee will decide whether to approve or disapprove the school. If it disapproves, the school will have a period of time to improve, and the School Committee will then reconsider it for approval. If the School Committee approves the Academy, the committee will review the school every two years, chiefly through written communications, to ensure that the school continues to operate satisfactorily. While ordinarily the School Committee would require a private school like the Academy to make a formal "request" for approval, see New Life, 666 F.Supp. at 299-300, it has said that it will seek to accommodate the Academy's religious tenets by asking the Academy simply to submit the required factual information, id. The School Committee will then conduct its "approval" examination on its own, without requiring the Academy to acknowledge that the information will be used as part of an "approval" process.
 
 
 14
 C. The Academy. The Academy is a school operated by an independent congregation of which the individual plaintiffs are members. New Life, 666 F.Supp. at 296-97. The Academy's religion teaches its members that
 
 
 15
 God is the sovereign and the final authority in all human conduct, [and] to submit their educational ministry for the prior or continued approval of secular authorities would violate the sovereignty of Christ over his church and would, therefore, be a sin.
 
 
 16
 New Life, 666 F.Supp. at 297. The Academy has said it has no religious objection to:
 
 
 17
 (a) complying with state health, safety and zoning rules, New Life, 666 F.Supp. at 298, 302;
 
 
 18
 (b) submitting written information to the School Committee about the number of its students, the number of hours and days taught, the curriculum, texts, the number of teachers, and the criteria for hiring teachers, id.;
 
 
 19
 (c) permitting School Committee officials to visit the Academy, at least occasionally, to meet administrators and teachers, to read texts, and to observe classes, id. at 299;
 
 
 20
 (d) teaching the subjects required by state law, and holding classes the number of days required by state law, id. at 302;
 
 
 21
 (e) hiring teachers with adequate credentials, provided the state does not specify the credentials or whom the Academy must hire or discharge, id. at 301;
 
 
 22
 (f) being incorporated under Massachusetts law (which it is), id. at 302 n. 9.
 
 
 23
 The Academy does object on religious grounds, however, to taking many of these same steps if they are part of a School Committee "approval" procedure, for the Academy does not want to admit or recognize, in any way, that the state has the authority to approve or disapprove the Academy's educational program. Id. at 300-03.
 
 
 24
 The Academy has proposed what it sees as a "less restrictive" way for the School Committee to proceed. It has proposed (1) that it furnish to the School Committee, on a voluntary basis, information about its activities, curriculum, students and teachers; (2) that it see that its students voluntarily take annual standardized examinations prepared by an outside source; (3) that it see that the School Committee obtain the exam results for review; and (4) that it provide or assist in arranging "follow-up" sessions (including discussions among students, teachers, parents, and School Committee representatives, and further testing) for students whose test results are poor. Id., 666 F.Supp. at 303, 307, 320.
 
 
 25
 D. The decision below. After holding evidentiary hearings, the district court held that the School Committee's proposed procedures violated the "free exercise" clause of the First Amendment. The court wrote that it was
 
 
 26
 persuaded that (1) providing basic information concerning the students, school and curriculum and (2) either standardized testing combined with individual follow-up when indicated, or (3) such testing and follow-up combined with a requirement that each teacher have appropriate academic credentials is less restrictive than the East Longmeadow [School Committee] approval process and sufficient to assure that New Life [Academy] students are adequately educated.
 
 
 27
 New Life, 666 F.Supp. at 320. The district court also held that the School Committee's proposed procedures violated the "establishment" clause of the First Amendment by excessively entangling the state in the Academy's religion. Id. at 322-25. As we have noted, the district court then enjoined the School Committee from following its proposed procedures, and from prosecuting (under compulsory attendance laws) any parent whose child attends the Academy.
 
 
 28
 After examining the record, we have come to legal conclusions different from those of the district court. We do not find the "standardized testing" proposal to be a satisfactory, significantly less burdensome alternative. For that reason, we cannot say that the School Committee's proposed procedure violates the Free Exercise Clause of the First Amendment. And we do not find that the School Committee's proposed procedure leads to "excessive entanglement" with religion, in violation of the Establishment Clause.
 
 II.
 Free Exercise of Religion
 
 29
 For ease of analysis, we shall consider the Academy's constitutional "free exercise" claim by asking two distinct questions: First, does the First Amendment's Free Exercise Clause forbid the state (i.e., the School Committee) to insist upon approving the secular education offered by a religious school that believes it sinful to submit even its secular education program to the approval of secular authorities? Second, if not, does the Free Exercise Clause forbid the School Committee to follow its proposed approval procedures rather than the "standardized testing" procedures that the Academy prefers?
 
 
 30
 To answer each of these questions, we must determine (1) whether the Academy's religious beliefs are sincerely held, Wisconsin v. Yoder, 406 U.S. 205, 215-16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 714-16, 101 S.Ct. 1425, 1430-31, 67 L.Ed.2d 624 (1981); (2) whether (and the extent to which) the relevant regulation burdens the exercise of those beliefs, Thomas, 450 U.S. at 717-18, 101 S.Ct. at 1431-32; Yoder, 406 U.S. at 220, 92 S.Ct. at 1535; Sherbert v. Verner, 374 U.S. 398, 403-06, 83 S.Ct. 1790, 1793-95, 10 L.Ed.2d 965 (1963); (3) if so, whether the regulation nonetheless serves a compelling, or overriding, governmental interest, Hobbie v. Unemployment Appeals Comm'n of Florida, 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987); United States v. Lee, 455 U.S. 252, 257-58, 102 S.Ct. 1051, 1055-56, 71 L.Ed.2d 127 (1982); Yoder, 406 U.S. at 221, 92 S.Ct. at 1536; Sherbert, 374 U.S. at 406, 83 S.Ct. at 1795; and (4) if so, whether the School Committee might nonetheless adequately serve that interest in a "less restrictive," i.e., a less burdensome, way, Thomas, 450 U.S. at 718, 101 S.Ct. at 1432; Sherbert, 374 U.S. at 407, 83 S.Ct. at 1795.
 
 
 31
 A. The First Question: Approval in General. We believe the legal answer to the first question is clear. The Free Exercise Clause does not prohibit the School Committee from enforcing, through appropriate means, a state law that requires "approval" of the Academy's secular education program. We concede that the Academy has a sincere, relevant religious belief that it ought not participate in any such secular approval process. See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 108 S.Ct. 1319, 1325, 99 L.Ed.2d 534 (1988); Hobbie, 480 U.S. at 144 n. 9, 107 S.Ct. at 1051, n. 9; Thomas, 450 U.S. at 714, 716, 101 S.Ct. at 1430, 1431. We also agree with the Academy that the very existence of a state approval requirement will burden the exercise of its religion by placing it under "substantial pressure ... to modify [its] behavior and to violate [its] beliefs." Hobbie, 480 U.S. at 141, 107 S.Ct. at 1049 (quoting Thomas, 450 U.S. at 718, 101 S.Ct. at 1432). That is to say, given the adverse consequences that would attend a failure to obtain approval, the state requirement could well lead the Academy to participate, at least to some degree, in the approval process, thereby violating, at least to some degree, its religious principles.
 
 
 32
 Nonetheless, the state's interest in making certain that its children receive an adequate secular education is "compelling." See Ambach v. Norwick, 441 U.S. 68, 75-76, 99 S.Ct. 1589, 1593-94, 60 L.Ed.2d 49 (1979) ("public school teachers may be regarded as performing a task 'that go[es] to the heart of representative government.' Public education, like the police function, 'fulfills a most fundamental obligation of government to its constituency.' ") (citations omitted); Yoder, 406 U.S. at 213, 92 S.Ct. at 1532 ("There is no doubt as to the power of the State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. Providing public schools ranks at the very apex of the function of a State.") (citation omitted; emphasis added); Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) ("Today, education is perhaps the most important function of state and local governments.") (emphasis added); Meyer v. Nebraska, 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (education is of "supreme importance"); Murphy v. Arkansas, 852 F.2d 1039, 1042 (8th Cir.1988) ("it is 'settled beyond dispute, as a legal matter, that the state has a compelling interest in ensuring that all its citizens are being adequately educated.' ") (quoting trial court); Palmer v. Board of Education of the City of Chicago, 603 F.2d 1271, 1274 (7th Cir.1979) ("There is a compelling state interest in the choice and adherence to a suitable curriculum for the benefit of our young citizens and society. It cannot be left to individual teachers to teach what they please."), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980). And no one in this case suggests any "less burdensome" way to guarantee the adequacy of the Academy's secular education than to subject it to some form of state evaluation process.
 
 
 33
 We therefore conclude that the many cases holding that the Free Exercise clause allows a state reasonably to regulate private secular education (including secular education offered by religious institutions) govern here. They make clear that the state of Massachusetts may, as a general matter, authorize its towns to approve or disapprove the Academy's secular education, as provided in the state statute. Mass.Gen.L. ch. 76, Sec. 1. See Runyon v. McCrary, 427 U.S. 160, 178, 96 S.Ct. 2586, 2598, 49 L.Ed.2d 415 (1976) ("The Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools ... they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation."); Board of Education v. Allen, 392 U.S. 236, 245-47 & n. 7, 88 S.Ct. 1923, 1927-28 & n. 7, 20 L.Ed.2d 1060 (1968) ("a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction.... [I]f the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function."); Everson v. Board of Education of the Township of Ewing, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947) ("This Court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements which the state has power to impose.").
 
 
 34
 Of course, the standards the School Committee applies in deciding whether to approve or to disapprove the secular education program must be reasonable. See, e.g., State v. Whisner, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976) (striking down as "unreasonable" regulations so "pervasive and all-encompassing" that they "effectively eradicate" the school's private autonomy). But, at this stage of the proceeding, before the School Committee has presented or applied its precise standards (other than the standards contained in the statute), we have no reason to think that the substantive content of those standards will prove constitutionally impermissible.
 
 
 35
 B. The Second Question: The Proposed Procedures. The second question--that of comparative means--is more difficult. Does the Free Exercise Clause permit the School Committee to use its preferred "information gathering" procedures (written information/teacher credentials/visits), or does it prohibit the Committee from doing so, because another procedure--the Academy's preferred method (standardized testing)--is a less restrictive alternative? Again, we take the Academy's profession of its religious beliefs as sincere. And we also are willing to accept the district court's finding that the Committee's proposals would burden the Academy in exercising its religious beliefs (perhaps because, compared with standardized testing, the Academy believes the Committee's procedures would involve the school more deeply in the approval process). Moreover, the state's educational interest is "compelling."
 
 
 36
 But the question remains whether or not "standardized testing" is a "less restrictive" way to achieve the state's legitimate, "compelling" goals. In answering this question, we begin with the Supreme Court's requirement that when a state chooses to attain its goals in a way which imposes a burden upon the free exercise of religion, the state must show that "it is the least restrictive means of achieving some compelling state interest," Thomas, 450 U.S. at 718, 101 S.Ct. at 1432 (emphasis added), that "it is essential to accomplish an overriding governmental interest," Lee, 455 U.S. at 257-58, 102 S.Ct. at 1055 (emphasis added).
 
 
 37
 The term "least restrictive means," however, is not self-defining. In applying that term, one must pay heed to Justice Blackmun's caution, offered in another context, that " 'least drastic means' is a slippery slope ... [, for a] judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down." Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring). Consequently, our analysis--our effort to determine whether testing is, constitutionally speaking, a "less restrictive alternative"--must reflect additional guidance that the Supreme Court has provided, of three specific sorts.
 
 
 38
 First, the Court has repeatedly spoken of the need to "balance" compelling state interests against probable burdens upon religious freedom. See, e.g., Texas Monthly, Inc. v. Bullock, --- U.S. ----, 109 S.Ct. 890, 902, 103 L.Ed.2d 1 (1989) (plurality opinion) ("the balancing test we set forth in Lee must be performed on a case-by-case basis"); Bob Jones University v. United States, 461 U.S. 574, 603-04 & n. 29, 103 S.Ct. 2017, 2034-35 & n. 29, 76 L.Ed.2d 157 (1983) (surveying cases finding state's interest to "outweigh" free exercise claims); Lee, 455 U.S. at 259, 102 S.Ct. at 1056 ("The Court has long recognized that balance must be struck between the values of the [state interest and] religiously based exemptions."); McDaniel v. Paty, 435 U.S. 618, 628 n. 8, 98 S.Ct. 1322, 1328-29 n. 8, 55 L.Ed.2d 593 (1978) (plurality opinion) (describing "the delicate balancing required" in free exercise cases); Yoder, 406 U.S. at 215, 92 S.Ct. at 1533 (state interests "of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."). Though the Court has also used the term "strict scrutiny" to label its free exercise test, Hobbie, 480 U.S. at 141, 107 S.Ct. at 1049, it is clear from reading Hobbie that the Court used this label simply to distinguish its "compelling state interest" test from the less stringent test espoused by a minority of the Court in Bowen v. Roy, 476 U.S. 693, 707-08, 106 S.Ct. 2147, 2156-57, 90 L.Ed.2d 735 (1986) (Opinion of Burger, C.J.). See Hobbie, 480 U.S. at 141-42, 107 S.Ct. at 1049-50.
 
 
 39
 Second, the Court has emphasized the need to determine the extent to which accommodation of religious belief will interfere with achieving the state's compelling interest. See Lee, 455 U.S. at 257, 259, 102 S.Ct. at 1055, 1056 ("Not all burdens on religion are unconstitutional.... [the] inquiry is whether accommodating the [religious] belief will unduly interfere with fulfillment of the governmental interest") (emphasis added); Yoder, 406 U.S. at 234, 92 S.Ct. at 1542 (courts must not favor alternatives that would "materially detract" from furtherance of compelling state interests); Braunfeld v. Brown, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961) (plurality opinion) (question is whether "the state may accomplish its purpose by means which do not impose such a burden") (emphasis added).
 
 
 40
 Third, the Court has made clear that administrative considerations play an important role in determining whether or not the state can follow its preferred means. See, e.g., Lee, 455 U.S. at 259-60, 102 S.Ct. at 1056 (government need not create an exemption in social security tax for Amish employers, whose religious beliefs prohibit them from paying for or accepting social security benefits, because such an exemption would make it "difficult" to serve "the broad public interest in maintaining a sound tax system"). To understand this point, which is of particular importance here, consider the possibility that a particular religious group objects, not to a state welfare program, but to the method of distribution of welfare forms, or to the location of a welfare office, or to any of the myriad ways in which the state may choose to administer its welfare programs. One may find a compelling state interest in the state's providing welfare, but it is more difficult to say that the state's interest in any particular means of distributing the welfare is "compelling." That is, it is more difficult to say this unless, and until, one takes account of the need to have some reasonably stable and reasonably flexible administrative system. For, if it is too easy for religious groups with different religious beliefs to force (perhaps through time consuming litigation) differing, say, costly or complex, administrative accommodations with too little reason rooted in their religious faiths, then a rule of law that too readily requires such multiple administrative accommodations can itself become a rule of law that prevents the state from offering the welfare or educational or other "compelling" program. That is why the Supreme Court has warned that "government simply could not operate if it were required to satisfy every citizen's religious needs and desires," Lyng, 108 S.Ct. at 1327; and why it has told us that because "we are a cosmopolitan nation made up of people of almost every conceivable religious preference," courts must not demand every last accommodation lest they "radically restrict the operating latitude of the legislature." Braunfeld, 366 U.S. at 606, 81 S.Ct. at 1147. See also Lee, 455 U.S. at 260-61, 102 S.Ct. at 1056-57 (government programs "could not function" if they had to accommodate "myriad exceptions flowing from a wide variety of religious beliefs;" "every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs."). That is to say, the Free Exercise Clause must give the state some degree of administrative leeway in achieving compelling interests.
 
 
 41
 We take this authority, and these considerations, to mean that we must determine in a practical way whether or not "standardized testing" is a constitutionally mandated "less burdensome" alternative, keeping in mind the relevant constitutional interests and their relative strengths. To what degree would "standardized testing" better satisfy the Academy's religious scruples? To what extent would it likely permit the state to achieve its legitimate educational objectives? To what extent does it threaten potential administrative difficulties, including those costs and complexities which (when combined with the precedential effect of a rule of law that would give similar rights to control administrative detail to others with different beliefs) may significantly interfere with the state's ability to achieve its educational objectives?
 
 
 42
 In reviewing the record, we have kept in mind both these considerations and the fact that Massachusetts' legitimate interest extends, not only to the existence of private school education, but also to its quality. See Allen, 392 U.S. at 245-47, 88 S.Ct. at 1927-28; Everson, 330 U.S. at 18, 67 S.Ct. at 513; Murphy, 852 F.2d at 1042; Palmer, 603 F.2d at 1274; Care and Protection of Charles, 399 Mass. 324, 336, 504 N.E.2d 592, 599-600 (1987). We have also taken note of the district court's finding that the School Committee had "a reasonable basis to be concerned about the qualifications of at least some New Life [Academy] teachers to instruct children." New Life, 666 F.Supp. at 306. As a result, we have concluded that the First Amendment does not preclude the School Committee from employing its approval procedures; the record reveals too many potential educationally-related difficulties, and too little alleviation of the burden on religion, to justify the district court's conclusion that standardized testing is a "less restrictive alternative." We believe, in other words, that the testing proposal would "materially detract," Yoder, 406 U.S. at 234, 92 S.Ct. at 1542, from the state's efforts to "accomplish its [compelling] purpose," Braunfeld, 366 U.S. at 607, 81 S.Ct. at 1148, thereby "unduly interfer[ing] with fulfillment of the governmental interest," Lee, 455 U.S. at 259, 102 S.Ct. at 1056, without a compensating reduction in the "restrictive" nature of the burden imposed on religious freedom, Thomas, 450 U.S. at 718, 101 S.Ct. at 1432.
 
 
 43
 First consider the educational difficulties. The standardized testing system that the district court preferred is a voluntary system; but how can the School Committee find assurance that a child will receive an adequate secular education through reliance on a monitoring system that is voluntary? How can the Academy make certain the students and their parents agree to the testing plan? Suppose they do not. Suppose a parent refuses to permit the Academy to give the Committee the test results. Suppose a parent refuses to permit his child to participate in the testing, or in the remedial "follow-up." (Suppose, for example, a parent decided that doing so amounted to impermissible cooperation with secular authorities.) Is the School Committee then to enforce truancy laws against the individual parent? Is it to demand expulsion of the child? Is it to "disapprove" the entire Academy? And consider these problems if several parents withdraw their children from the testing scheme. It is difficult to see how a purely voluntary system for monitoring nonpublic education can serve the state's interest in assuring educational quality. Accord Blount v. Department of Educational and Cultural Services, 551 A.2d 1377, 1381-82, 1384 (Maine 1988) (rejecting voluntary plan for assuring quality of private schooling provided in compliance with compulsory attendance law). Yet a system that relies heavily upon state laws to force testing requirements on individual parents threatens to burden their own religious freedom. See infra p. 950.
 
 
 44
 Moreover, the testing plan provides for the School Committee to conduct remedial "follow-up" for children who test poorly; but how can the School Committee administer the individual child remedial "follow-up" without running afoul of the First Amendment's Establishment Clause, a Clause that may prohibit state-funded counseling, testing, and special remedial education, at least when provided on the private school's premises? See School District of Grand Rapids v. Ball, 473 U.S. 373, 386-88, 105 S.Ct. 3216, 3223-25, 87 L.Ed.2d 267 (1985); Wolman v. Walter, 433 U.S. 229, 241-48, 97 S.Ct. 2593, 2602-05, 53 L.Ed.2d 714 (1977); Meek v. Pittenger, 421 U.S. 349, 369-72, 95 S.Ct. 1753, 1765-67, 44 L.Ed.2d 217 (1975).
 
 
 45
 Further, can the School Committee safely rely upon standardized testing to determine what will occur in the classroom? Teacher credentials, review of written curricula, and school visits offer the Committee a way of finding out what does actually occur in respect to teaching; tests, at best, reveal what has occurred. Can the Committee satisfactorily relate the results to past teaching? Does an average Academy-pupil score lower than an average public-school-pupil score reflect inadequate teaching, inappropriate subject matter, a different student body background, or other factors having nothing to do with the "thoroughness and efficiency" of this private school, compared with public schools? Do equivalent test results mean comparable teaching or worse (or better) teaching to different kinds of student bodies? How is the School Committee to interpret results that differ in different subject matter areas? Can it be certain that good results reflect good teaching, i.e., the teaching of intellectual skills, discipline and complete subject matter, rather than simply teaching the answers to questions the teachers believe will appear on tests? And how can testing measure those important aspects of an adequate education that do not readily reduce themselves to standardized test questions, aspects such as practical vocational skills, the "basic tools by which individuals might lead economically productive lives," Plyler v. Doe, 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982); accord Yoder, 406 U.S. at 221, 92 S.Ct. at 1536 ("education prepares individuals to be self-reliant and self-sufficient participants in society"); or the values of civic participation that are "necessary to the maintenance of a democratic political system," Ambach, 441 U.S. at 77, 99 S.Ct. at 1595; accord Yoder, 406 U.S. at 221, 92 S.Ct. at 1536 ("some degree of education is necessary to prepare our citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence")?
 
 
 46
 We ask these questions not to suggest they cannot be answered. Indeed, some states have answered them and use testing as a means for monitoring the quality of education in nonpublic schools, though such states may have different educational quality objectives than does Massachusetts, and we can find no state that uses a voluntary testing system, the "alternative" system at issue here. See, e.g., Alaska Stat. Sec. 14.45.120 (1987) (mandatory testing of nonpublic school students); N.C.Gen.Stat. Secs. 115C-549, 115C-550 (1987) (same); S.D.Codified Laws Ann. Sec. 13-27-3 (Supp.1989) (same, supplemented by state authority to visit nonpublic schools and to investigate the competence of nonpublic school teachers); W.Va.Code Sec. 18-28-3 (1988) (mandatory testing of nonpublic school students). Rather, we ask these questions in order to indicate the type of obstacles, and the significant additional administrative problems, that the need to answer them would create for, and impose upon, this School Committee: one that intends to use a written information/credentials/visit basis for determining approval, but one that is not familiar with, and is skeptical of, a system of standardized testing. Cf. Care and Protection of Charles, 399 Mass. at 336, 504 N.E.2d at 600 (Massachusetts' highest court concluding that "the approval process required under G.L. c. 76, Sec. 1, is necessary to promote effectively the state's substantial interest" in assuring the quality of education) (emphasis added). And, of course, those potential obstacles are potentially aggravated where a court imposes a legal requirement to use such a system, for then, presumably, a religious group much like the Academy, using only slightly different religious reasoning to find the written information/credentials/visit system less burdensome than the "standardized test" system, would have a similar legal right to force the School Committee to use the former system in its case. Legally obligated to employ the method preferred by each religious group, the towns of Massachusetts might find it difficult to implement a coherent system of furthering the state's compelling interest in educational quality; but even in the absence of multiple competing demands, the questions we have raised indicate the formidable administrative hardships that the effort to develop a standardized testing system would impose upon the School Committee.
 
 
 47
 Second, consider the comparative religious "burden." The Academy's religious objection is to the fact of secular sanction of its secular education program; it objects to any recognition of the fact that state authorities may approve or disapprove its program. The Academy has specifically stated that it does not object to supplying the School Committee with the written information that it seeks, adding that the Committee is "welcome to visit at anytime." Letter from Pastor Chase, quoted in New Life, 666 F.Supp. at 299. It objects to those procedures only as they are part of an "approval" process. Thus, its religiously-based preference for the "standardized testing" method for obtaining approval must rest upon a belief that this alternative involves the Academy less, implicates the Academy less, in the secular approval granting process.
 
 
 48
 The standardized testing alternative, however, undeniably involves and implicates the Academy, at least to a degree, in the very approval process to which it objects. The Academy will have to obtain the School Committee's approval for the type of tests it gives, and the conditions in which it gives them. It will have to negotiate with the Committee about what conclusions to draw from test results, as well as the nature of "follow-up" or other remedial measures for individual students who do badly on the tests. It may have to negotiate about the changes it might make in its own programs should too many students do badly. And, since testing of each student will take place annually, this involvement potentially will take place every year. Hence the Academy will have to endure state "approval" of the education it provides to each student each year.
 
 
 49
 Moreover, the "testing" plan risks imposing still greater burdens upon individual parents or children, insofar as it foresees the School Committee enforcing testing or remedial or alternative schooling obligations upon individual families, potentially through use of the courts, and potentially under circumstances where the Academy itself retains the state's approval. That is, unless purely voluntary, it foresees the Committee applying coercive criminal and civil enforcement measures to the parents of children who test poorly. See New Life, 666 F.Supp. at 321 (recommending, under testing proposal, that town enforce test-taking through criminal prosecutions and civil orders to remove children from their families). See also Yoder, 406 U.S. at 218, 92 S.Ct. at 1534 (finding burden imposed on religious liberty by criminal penalties); Braunfeld, 366 U.S. at 605, 81 S.Ct. at 1147 (similar); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (similar). Given the fact that the Academy has expressed a preference for standardized testing and the fact that the Academy is the best judge of its own religious needs and interests, we cannot say that standardized testing is no less burdensome than the School Committee's proposal, but neither can we see how it substantially alleviates the burden upon the free exercise of religion, nor how it could represent a major improvement.
 
 
 50
 Finally, the weight of legal precedent is strongly against the Academy's position. Some cases specifically state that the Constitution does not require a state to employ a "standardized testing" approach in evaluating the secular education provided at private religious schools. See Fellowship Baptist Church v. Benton, 815 F.2d 485, 494 (8th Cir.1987); Blount v. Department of Educational and Cultural Services, 551 A.2d 1377, 1384-85 (Maine 1988); Johnson v. Charles City Community Schools Board of Education, 368 N.W.2d 74, 80-84 (Iowa), cert. denied sub nom. Preussner v. Benton, 474 U.S. 1033, 106 S.Ct. 594, 88 L.Ed.2d 574 (1985); Sheridan Road Baptist Church v. Department of Education, 426 Mich. 462, 484, 396 N.W.2d 373, 382-83 (1986), cert. denied, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987); State v. Rivinius, 328 N.W.2d 220 (N.D.1982), cert. denied, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); State v. Patzer, 382 N.W.2d 631 (N.D.), cert. denied, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 50 (1986). Other cases uphold the constitutionality of "approval" requirements for private religious schools that seem at least as burdensome as those present here. See Fellowship Baptist Church v. Benton, 815 F.2d 485; Johnson, 368 N.W.2d at 80-84; Sheridan Road Baptist Church, 426 Mich. 462, 396 N.W.2d 373; State ex rel. Douglas v. Faith Baptist Church, 207 Neb. 802, 301 N.W.2d 571, appeal dismissed for want of a substantial federal question, 454 U.S. 803, 102 S.Ct. 75, 70 L.Ed.2d 72 (1981); Rivinius, 328 N.W.2d 220; State v. Shaver, 294 N.W.2d 883 (N.D.1980); cf. Windsor Park Baptist Church, Inc. v. Arkansas Activities Ass'n, 658 F.2d 618 (8th Cir.1981). Still other cases simply uphold the state approval statute itself. See Blackwelder v. Safnauer, 689 F.Supp. 106, 128-35 (N.D.N.Y.1988), aff'd on question of mootness, 866 F.2d 548 (2d Cir.1989); North Valley Baptist Church v. McMahon, 696 F.Supp. 518, 528-30 (E.D.Cal.1988); Jernigan v. State, 412 So.2d 1242 (Ala.Crim.App.1982). And some cases uphold regulations applied to religious "home school" education. See, e.g., Murphy v. Arkansas, 852 F.2d 1039, 1041-43 (8th Cir.1988); Duro v. District Attorney, 712 F.2d 96, 98 (4th Cir.1983) (upholding effective total ban on home schooling), cert. denied, 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 230 (1984); Blackwelder, 689 F.Supp. at 128-35; Hanson v. Cushman, 490 F.Supp. 109 (W.D.Mich.1980); Jernigan, 412 So.2d 1242; Burrow v. State, 282 Ark. 479, 669 S.W.2d 441 (1984) (upholding ban on home schooling); People v. Turner, 121 Cal.App.2d Supp. 861, 263 P.2d 685 (1953) (similar), appeal dismissed for want of a substantial federal question, 347 U.S. 972, 74 S.Ct. 785, 98 L.Ed. 1112 (1954); Blount, 551 A.2d 1377; Care and Protection of Charles, 399 Mass. 324, 504 N.E.2d 592; Patzer, 382 N.W.2d 631; State v. Schmidt, 29 Ohio St.3d 32, 505 N.E.2d 627, cert. denied, 484 U.S. 942, 108 S.Ct. 327, 98 L.Ed.2d 354 (1987); State v. Riddle, 168 W.Va. 429, 285 S.E.2d 359 (1981).
 
 
 51
 At the same time, this case differs significantly from the leading case in which the courts have upheld a "free exercise" claim against a state effort to control secular education provided by a religious institution. In that case, Wisconsin v. Yoder, the Supreme Court held that the First Amendment required a partial exemption (for students aged 14 to 16) from the state's compulsory school attendance law, where continued attendance for those two additional years threatened "the continued survival of Amish communities," 406 U.S. at 209, 92 S.Ct. at 1530, where compulsory attendance after the eighth grade "would gravely endanger" the exercise of basic Amish religious beliefs, id. at 219, 92 S.Ct. at 1535, and where the Amish community's own system of education for children over age fourteen was close to "ideal," id. at 223, 92 S.Ct. at 1537. Here, unlike the case of the Amish, and as the district court noted, see New Life, 666 F.Supp. at 302, the School Committee's proposed procedures do not threaten interference with religious practices, prayer, or religious teaching; and the record, while indicating a sincere religious scruple, does not suggest that enforcement of the proposed School Committee procedures would destroy a religious community's way of life. Accord State v. Shaver, 294 N.W.2d 883, 897 (N.D.1980) (finding that burden imposed by prior approval statute is "minimal," "incidental," and would "not pose a very real threat of undermining the Bible Baptist Church members' community and religious practices") (emphasis in original). Nor does the record support the view that the Academy, left on its own, would provide "ideal" or even adequate secular education. See New Life, 666 F.Supp. at 301 (discussing shortcomings of the Academy's educational program). All these factors make this case quite unlike Yoder. See also Mozert v. Hawkins County Board of Education, 827 F.2d 1058, 1067 (6th Cir.1987) ("Yoder rested on such a singular set of facts that we do not believe it can be held to announce a general rule"), cert. denied, --- U.S. ----, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988); Blackwelder, 689 F.Supp. at 135 ("the holding in Yoder must be limited to its unique facts [in which a child will live in] a successful [religious] community separate and apart from American society in general").
 
 
 52
 The only other significant case that we have found arguably relevant and helpful to the Academy is State v. Whisner, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976), which invalidated state regulation of a private school where the regulations at issue provided that the board of education could control "all activities" of the private school, id., 351 N.E.2d at 765-66; the court found these regulations "so pervasive and all-encompassing" that they would "effectively eradicate the distinction between public and non-public education," id., 351 N.E.2d at 768; and it therefore held them unconstitutional. The case before us does not involve any so burdensome, all-encompassing, regulation.
 
 
 53
 In sum, given the "standardized testing" alternative's voluntary (and thus unsatisfactory) nature, the difficult administrative problems that it threatens to impose, its uncertain potential for achieving the state's legitimate "educational quality" objectives, and the limited extent to which it will alleviate the burden the "approval requirement" itself imposes upon the Academy's free exercise of religion, we conclude that, in the factual context of this case, the "standardized testing" alternative is not a "less restrictive alternative" for First Amendment "free exercise" purposes. The First Amendment, therefore, does not prevent the School Committee from using its preferred written information/teacher credential/school visit method. We add that we now consider these latter methods only as the School Committee has proposed them here, in outline form; we are not examining their actual implementation.
 
 
 54
 Our answer to the second question, together with our answer to the first question, means that the School Committee's proposals do not violate the First Amendment's Free Exercise Clause.
 
 III.
 Establishment of Religion
 
 55
 The "Establishment Clause" question in this case is whether the state "approval" requirement or the School Committee's proposed methods of gathering the information needed to decide the approval question will "foster an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (quoting Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)).
 
 
 56
 The relevant elements of the proposed state activities include: a) the act of approving or disapproving; b) obtaining written information about secular teaching programs from the Academy; c) examining the teaching credentials of those who teach secular subjects; d) one or more occasional visits to the school, and e) the making of suggestions to the Academy about how it might obtain approval if it initially fails to do so. The Academy does not argue that the first two of these elements pose entanglement concerns. The review of credentials appears to be of concern only as it indicates a need for the School Committee to visit the school, and insofar as it might lead the School Committee to insist that the Academy hire different teachers. The visits will consist of at least one initial visit where the visitors (who represent the School Committee) will read texts, examine teaching plans for secular courses, consider curricula, observe some classes, and discuss these matters with the school administration. The School Committee foresees additional visits only if the teaching credentials are inadequate. Since the Academy has no religious objection to hiring teachers with adequate credentials, and since such teachers seem available, see New Life, 666 F.Supp. at 301 & nn. 5 & 7, additional visits might not take place, though the School Committee may well insist that the Academy hire better-credentialed faculty. Any School Committee suggestions for improvement will concern only secular topics; neither observations nor suggestions will consider religious matters; indeed, Massachusetts law forbids the School Committee to rest its approval or disapproval upon "religious teaching." See Mass.Gen.L. ch. 76, Sec. 1.
 
 
 57
 In determining whether this "involvement" amounts to impermissible "excessive entanglement," we assume that the Committee will implement its procedures reasonably. We assume at this point that any visits, or suggestions, will comply with the statute's proscription against basing approval decisions on "religious teaching." (We also note that the "standardized testing" alternative also means state involvement, for example, in remedial programs for individual students.) We have kept in mind that the law prohibits only "excessive" entanglements, not all state contacts with religious institutions. See Larkin v. Grendel's Den, Inc., 459 U.S. 116, 123, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982). We have then compared the School Committee's proposals with the factual circumstances at issue in those cases where the courts have found impermissible entanglements. And, having done so, we can find no controlling similarities; the degree of relevant state involvement here is significantly less.
 
 
 58
 The approval requirement and procedures do not involve state provisions of financial aid nor, on any reasonable interpretation of the School Committee's proposals, do they involve, to any significant degree, state funding of educational services. See Bowen v. Kendrick, --- U.S. ----, 108 S.Ct. 2562, 2577-78, 101 L.Ed.2d 520 (1988) (noting that the troublesome "entanglement" cases typically involve "aid to parochial schools"); School District of Grand Rapids v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (discussing impermissible forms of public assistance to private religious schools); Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) (rejecting public educational services provided at private religious schools); Wolman v. Walter, 433 U.S. 229, 241-44, 97 S.Ct. 2593, 2602-03, 53 L.Ed.2d 714 (1977) (similar); Meek v. Pittenger, 421 U.S. 349, 369-72, 95 S.Ct. 1753, 1765-67, 44 L.Ed.2d 217 (1975) (similar). Nor (interpreting the Committee's proposals reasonably) do the Committee's methods involve any "pervasive state presence in the sectarian schools," or "frequent contacts between [state and private school] teachers," Aguilar, 473 U.S. at 413, 105 S.Ct. at 3238. The state intends no "comprehensive, discriminating and continuing state surveillance" of the sort at issue in Lemon, 403 U.S. at 619, 91 S.Ct. at 2114. The School Committee's visitors will not "assess[ ] or compar[e] ... religious curricula," Members of the Jamestown School Committee v. Schmidt, 699 F.2d 1, 12 (1st Cir.), cert. denied, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983); they will not express religious views, or express either approval or disapproval of any religious matter, see Wolman, 433 U.S. at 241-44, 97 S.Ct. at 2602-03; Meek, 421 U.S. at 369-72, 95 S.Ct. at 1765-67; nor, in any other way that we can see, will they seek to monitor the separation between religious and secular activities, see Aguilar, 473 U.S. at 409-13, 105 S.Ct. at 3236-38; cf. Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 765, 96 S.Ct. 2337, 2353, 49 L.Ed.2d 179 (1976) (upholding state aid where on-site monitoring of use of aid was not necessary); Tilton v. Richardson, 403 U.S. 672, 687-88, 91 S.Ct. 2091, 2100-01, 29 L.Ed.2d 790 (1971) (similar). Given the simple "checkup" purpose of the visit, and interpreting the proposal reasonably, we cannot now say that the state is embarking upon the kind of mission that seems likely to force it to "examine the content and curricula of religious programs," Members of the Jamestown School Committee, 699 F.2d at 13, or to evaluate the "religious content" of the Academy's teaching, id. at 17 (concurrence). Certainly the School Committee will not exercise the overarching control of the school's possibly religiously-motivated choices that was struck down in NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 502-03, 99 S.Ct. 1313, 1319-20, 59 L.Ed.2d 533 (1979) (rejecting NLRB jurisdiction over labor disputes at religious high schools, because NLRB would have to resolve unfair labor practice claims in which the school asserted that its decisions were motivated by religious creeds, decide what religious educational activities were mandatory subjects of collective bargaining, and engage in an intrusive "process of inquiry" into the religious bases of church-employee disputes), and Surinach v. Pesquera de Busquets, 604 F.2d 73, 79 (1st Cir.1979) (rejecting government's continuing control over detailed expenditures of Catholic schools, because such control would "permit [the government] to intrude upon decisions of religious authorities as to how much money should be expended and how funds should be allotted to serve the religious goals of the students").
 
 
 59
 We can imagine how the School Committee might, in practice, enforce the approval requirement and implement its proposed procedures (particularly the observation of classes) in ways that would unreasonably and unnecessarily entangle it with the religious aspect of teaching. But one might find similar theoretical possibilities lurking within virtually any state approval procedure. Here, the proposal to observe classes is primarily a proposal to visit the school, to see if the school teaches what it says it teaches, and to observe children being taught such secular subjects as mathematics, geography, spelling, reading and writing. Additional visits will occur as an accommodation to the Academy only if the school fails to meet standards for its teachers' credentials, and then simply to see whether teachers, say, lacking university degrees, are able adequately to teach secular subjects. See, e.g., Fellowship Baptist Church, 815 F.2d at 494-95 (upholding teacher certification requirements); Sheridan Road Baptist Church, 426 Mich. 462, 396 N.W.2d 373 (same). We are aware of no case that goes so far as to find an Establishment Clause violation in such circumstances. Cf. Aguilar, 473 U.S. at 409, 410, 105 S.Ct. at 3236, 3237 (rejecting a program that "inevitably" entangles the state); Meek, 421 U.S. at 370, 95 S.Ct. at 1765 (rejecting "necessarily" entangling program); Board of Education v. Allen, 392 U.S. at 248, 88 S.Ct. at 1929 (upholding program where record showed no evidence of impermissible state involvement in religion). Indeed, since the School Committee now has simply proposed, in outline form, the possibility of a future "checkup" visit, to say that the Establishment Clause forbids the proposal would amount to saying that the Clause forbids any classroom observation or "checkup," a holding that could significantly inhibit the state's efforts to evaluate the secular education provided by religious schools (or home schools), evaluations that (as we observed in Part II above) are of critical importance to the state. See Allen, 392 U.S. at 244-48, 88 S.Ct. at 1927-29 (finding no Establishment Clause bar to program of state assistance to private religious school students, in part because the program furthered the state interest in assuring the quality of secular education).
 
 
 60
 Since the proposal for one visit involving observing classes appears to be reasonably necessary to the state's furtherance of its compelling interest in assuring the quality of secular education, since it involves no monitoring of the uses to which secular aid will be put, see supra at 952-53, and since there is now no reason to believe that additional visits will improperly entangle the School Committee in religious matters, we have no reason now to believe that the School Committee will implement its proposals in an unconstitutional way. We conclude that the School Committee's procedures for gathering information for its "approval" decision, as currently proposed, do not pose any "reasonable likelihood" of excessive entanglements, Surinach, 604 F.2d at 76 (citation omitted), resembling the kinds of entanglements found unconstitutional in prior cases. We therefore cannot find a violation of the First Amendment's Establishment Clause.
 
 
 61
 For these reasons the judgment of the district court is
 
 
 62
 Reversed.