STATE OF WEST VIRGINIA

*v.*

BOBBY E. RIDDLE

*and*

STATE OF WEST VIRGINIA

*v.*

ESTHER RIDDLE

(No. 14910)

Decided December 11, 1981.

*Gregory R. Reed* for appellant.

*Chauncey H. Browning*, Attorney General, *and S. Clark Woodroe*, Assistant Attorney General, for appellee.

*Gibbs & Craze Co. and David C. Gibbs, Jr.*, amicus curiae for Christian Law Ass'n.

NEELY, JUSTICE:

This is a test-case criminal appeal from a conviction of appellants in the Circuit Court of Harrison County for failure to obey the Compulsory School Attendance Law, *W.Va. Code,* 18-8-1 [1951] and from fines of ten dollars ($10) each.

On an information given by Florence Hunt, School Attendance Officer, appellants were arrested for failing to send their two children to the public schools. Trial before Magistrate Geraldine Floyd resulted in a conviction and a fine of ten dollars ($10) each. Appellants appealed to the Circuit Court of Harrison County where a trial *de novo* involving extensive expert testimony was held on 27 July 1979, and resulted again in conviction. The appellants now appeal to this Court on the grounds that *W.Va. Code,* 18-8-1 [1951], the Compulsory School Attendance Law, is unconstitutional as a violation of their rights under the first and fourteenth amendments to the *Constitution of the United States* because it abridges the free exercise of appellants' religion. Appellants rely upon *Wisconsin v.*

*Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) as authority for their position that the free exercise clause of the first amendment entitles them completely to disregard the West Virginia Compulsory School Attendance Law with impunity. We disagree and affirm the convictions.

Bobby and Esther Riddle are "Biblical Christians" who belong to a Methodist sect, the Wesley, which separated from the mainstream Methodist communion before the war between the states and remained resolutely unchanging. By "Biblical Christian" they mean one who "believes in the Bible as God's holy word." They dress modestly, and do not wear makeup or jewelry. A very important tenet of their belief is that one who sins after being saved loses his or her salvation. In short, they find themselves separated from, and at odds with, the values of the world.

Bobby and Esther Riddle have two children, Tim and Jill, both of compulsory school age. For a while they enrolled the children in a school called Emmanuel Christian Academy; however, they disagreed with that school's teaching of the reassuring doctrine that once a sinner is saved, he remains saved even if he accidently sins again. The Riddles strongly believe that a person may be saved, once, but if he ever sins again, he "will be lost." Bobby and Esther Riddle are determined to have their children totally indoctrinated and educated in their religious beliefs, with no smattering of heresy. They perceive public school, like television, as a pernicious influence on the young; thus to preserve their children from any false sense of spiritual security, the Riddles began teaching their children at home.

By all accounts in the record below, the Riddles did an excellent job—possibly better than the public schools could do. The Reverend Paul W. Lindstrom, head of the Christian Liberty Academy, which furnishes teaching aids and undertakes to set up schools in homes like the Riddles' as "satellite schools" extolled the Riddles' work. Dr. George Leonard Hopkins of the Jupiter Christian School in Flor-

ida testified that the achievements of the two children as measured on tests were excellent.

## I

The case before us is readily distinguishable from *Wisconsin v. Yoder, supra*. In *Yoder* the parents of teenage children declined to comply with the Wisconsin compulsory school attendance law but the United States Supreme Court reversed their convictions for noncompliance on the grounds that the parents had a valid first amendment defense to the prosecutions. In *Yoder* the plurality result in the Supreme Court turned on proof of an efficient system of informal education for Amish children designed to prepare them for life in the Amish community. *Yoder* involved members of the Conservative Amish Mennonite Church which had a history of three centuries as an identifiable religious sect whose way of life produced successful, self-sufficient, rural communities not incompatible with broader American society.

While the case before us and *Yoder, supra*, are similar in that in both cases the parents had sincere religious convictions which they thought would be endangered by sending their children to public schools, the similarity ends at that point. In *Yoder* the Supreme Court was confronted with an ancient religious community[1] which the record demonstrated had its own system of vocational and technical training designed to prepare its children for life in a pastoral, relatively self-contained society.

Furthermore, the Amish sent their children to neighborhood public schools for the first eight grades which guaranteed the acquisition of sufficient basic skills to

---

[1] The sense in which the Supreme Court used the word "community" in *Yoder* was coextensive with the German word *gemeinschaft*, *i.e.*, mutual participation, common possession or interest; communion; partnership, association. We borrow from the original language of psychology because in that language the distinction between *gemeinschaft* and a loose, unstructured association, *gesellschaft* is frequently made. While the religious communion of appellants as presented in the record before us raises to the level of *gesellschaft*, it does not achieve *gemeinschaft*.

provide a foundation for adult life outside of the religious community if a child so chose. Thus the court in *Yoder* was concerned with only the last two years of compulsory attendance; they were dealing with children who were near adults; and the court was not compelled by the facts to address the rights of children versus the rights of their parents under circumstances where religious beliefs, no matter how sincerely held, placed the two at odds. *See* Douglas, J., dissenting.

In the case before us we are not confronted by members of a recognized West Virginia community with a long history of successful preparation of its children outside of the public schools for a life in contemporary society. At least with regard to Jill Riddle who is age 10, we do not have a child who has completed the first eight years of primary education. Certainly Jill is not of an age where she would be able to express a desire to be educated in the mainstream of American life. The Supreme Court in *Yoder, supra,* succinctly articulated a balancing test when the right of the State to prepare its citizens for a successful life comes into conflict with religious convictions.[2] While in

---

[2] "There is no doubt as to the power of the State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. *See, e.g., Pierce v. Society of Sisters,* 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). Providing public schools ranks at the very apex of the function of a State. Yet even this paramount responsibility was, in *Pierce,* made to yield to the right of parents to provide an equivalent education in a privately operated system." 406 U.S. at 213, 92 S.Ct. at 1532. Here it is important to note the qualifying adjective "equivalent" in the phrase "equivalent education." It is always a question of fact and not one of law whether an education is "equivalent".

The Supreme Court has been careful to distinguish a mere idiosyncratic reluctance to send one's children to the public schools from a legitimate religious objection. In this regard the Court said:

"A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty

*Yoder,* dealing as it did with near adults, the balance tipped slightly in the direction of free exercise, in the case before us the balance is decidedly the other way.

In cases of this type there are actually two issues to be considered. The first, obviously, is the legitimacy of the first amendment, free exercise, objection to a public school education. The second, however, and the more important for the case before us, is the manner in which that free exercise claim is asserted. In *Yoder, supra,* the free exercise claim was compelling on the facts because of the long-established success of Amish culture. The Supreme Court obviously felt it unnecessary to address the manner in which the Amish raised their free exercise objection to compulsory school attendance, namely by a first amendment defense to a criminal prosecution. The case before us, however, is so entirely different from *Yoder* on the facts that we conclude that we are not at odds with the Supreme Court of the United States when we hold that the appellants before us have used an entirely inappropriate vehicle for presenting their first amendment claims.

## II

The relevant portion of *W.Va. Code,* 18-8-1 [1951] under consideration in this case is as follows:

> Compulsory school attendance shall begin with the seventh birthday and continue to the sixteenth birthday.

> Exemption from the foregoing requirements of compulsory public school attendance shall be made on behalf of any child for the following causes or conditions, each such cause or condition being subject to confirmation by the attendance authority of the county: . . . . .

> Exemption B. Instruction in home or other approved place.—Such instruction shall be in the home of such child or children or at some other

---

precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." 406 U.S. at 215, 92 S.Ct. at 1533.

place approved by the county board of education and for a time equal to the school term of the county. The instruction in such cases shall be conducted by a person or persons who, in the judgment of the county superintendent and county board of education, are qualified to give instruction in subjects required to be taught in the free elementary schools of the State. It shall be the duty of the person or persons giving the instruction, upon request of the county superintendent, to furnish to the county board of education, such information and records as may be required from time to time with respect to attendance, instruction, and progress of pupils enrolled between the ages of seven and sixteen years receiving such instruction; . . .

The record in this case demonstrates that the Riddles never requested the county superintendent of schools to approve their home as a place for instruction under Exemption B in *Code,* 18-8-1 [1951]. Furthermore, the appellants have proceeded in this Court upon the erroneous inference from the record that the county superintendent of schools requires a person who wishes to give instruction in the home to be a West Virginia certified teacher.

Exemption B of *Code,* 18-8-1 [1951] provides a reasonable vehicle for both balancing and reconciling the competing aims of state education and the proper exercise of first amendment, free exercise rights. While the appellants have arduously asserted their supposition that the county superintendent of schools would have required a person who wished to give instruction in the home to be a West Virginia certified teacher, Mr. William N. Ashcraft, who was the supervisor of attendance directors for the Harrison County Board of Education, testified that in at least one instance a person who was not a West Virginia certified teacher was approved to give home instruction.[3]

---

[3] Some legitimate confusion has arisen in this regard because the memorandum of the Harrison County Superintendent of Schools promulgating "Guidelines for Instruction in Homes, Private Parochial Schools or Other Approved Places" of 14 September 1978 did include the following paragraph:

Esther Riddle is formally educated through the twelfth grade. She is not certified to teach in the State of West Virginia but standard tests indicate that she is quite intelligent. The textbooks and other educational materials used by the Riddle children are part of a formalized curriculum purchased by the appellants. This curriculum is prepared and distributed by certified professional educators located in Prospect Heights, Illinois. The record indicates that the correspondence school in Illinois prepares and corrects homework and tests, provides lesson plans, assists Esther Riddle with pedagogical problems, and otherwise monitors the educational progress of Tim and Jill Riddle. The children are taught in a formal classroom setting from 8:30 a.m. to 3:00 p.m. daily, as well as in the evenings, five days per week, at least 180 days per school year. Esther Riddle instructs her pupils in all subjects required to be taught in the free elementary schools of West Virginia. However, all subject material is intertwined, integrated and saturated with religious doctrine. Tim and Jill have scored average or above on standardized achievement tests.

Even, however, assuming all of these facts developed by the record to be correct, is the State of West Virginia required to forebear in the enforcement of the compulsory school attendance law upon the suggestion of any parent who wishes to keep his child home from school that there is a conflict between school attendance and freedom of

---

Teacher credentials and certification requirements—

Persons who will be giving instruction must submit pertinent credentials which, in the judgment of the county superintendent meet state teachers' certification requirements and qualify the applicant to give instruction in elementary and or secondary schools.

Since this memorandum was promulgated primarily for the guidance of private *schools*, the language regarding teacher certification was undoubtedly directed to schools and not individual parents. The trial transcript in the circuit court indicates that employees of the Harrison County Board of Education encouraged the appellants to apply for qualification under Exemption B and at no time indicated that Mrs. Riddle's lack of certification alone would preclude her qualifying as a home instructor.

religion? Emphatically we answer this question in the negative.

Exemption B not only delineates the requirement that home instruction be conducted by "a person or persons who, in the judgment of the county superintendent and county board of education, are qualified to give instruction" but it also sets forth the condition that such instruction be monitored by the county board of education. Consequently, it is not appropriate for a person entirely to disregard the statute, await criminal prosecution, and then assert a first amendment defense. The *Yoder* case emphatically does not imply that the free exercise clause is an absolute bar to any intrusion whatsoever by the State. The Riddles do not assert that county monitoring of their home instruction in any way would infringe first amendment rights. They make no first amendment objection to the requirement of 180 school instructional days nor to the subject requirements which are designed to achieve basic literacy. Furthermore, they do not assert that the medical and other protective services offered by the public school system would in any way be in conflict with their religious tenets.

### III

This Court has expressly rejected a narrow definition of the purposes of a thorough and efficient system of schools as required by the West Virginia *Constitution.* In the landmark case of *Pauley v. Kelly,* 162 W. Va. 672, 255 S.E.2d 859 (1979) this Court said:

> We may now define a thorough and efficient system of schools: It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically.
>
> Legally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own

governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work—to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatability *[sic]* with others in this society. 255 S.E.2d at 877.

There are numerous urgent public policy reasons for having all children between the ages of 7 and 16 somewhere within the supervision of the county boards of education. Our schools not only teach but they are also responsible for ministering to the health needs of children by providing a reservoir of professional expertise capable of ferreting out health-related problems at an early stage. *See, e.g., W.Va. Code,* 18-5-22 [1923]. Primary school pupils are administered eye and hearing tests to determine any impairment in these two crucial faculties. *W.Va. Code,* 18-5-17 [1978]. Furthermore, regular attendance at the public schools guarantees proper immunization from disease, at least one balanced meal per day, and a certain minimal protection from outrageous parental abuse or neglect. *W.Va. Code,* 16-3-4 [1973] (compulsory immunization); *W.Va. Code,* 18-5-37 [1981] (school breakfast program); *W.Va. Code,* 49-6A-2 [1977] (mandatory reporting of suspected abuse).

The difficulty in inferring that *Yoder, supra,* permits a total disregard for the school attendance laws based on free exercise claims is that in *Yoder* the Supreme Court was confronted by a community which was defined not only through common membership in a religious sect, but also geographically and culturally. Consequently the specter of very young children entirely removed from any of the ordinary protections which a modern society provides did not haunt the majority's imagination in that case. As the Supreme Court indicated in *Yoder,* a delicate balancing test must be applied when compelling state interests run into conflict with the free exercise clause. *See* note 2, *supra.*

There can be little doubt that on occasion the state's interest will override even the most sincerely held religious convictions. For example, there is no question that a religious sect which incorporates human sacrifice as an integral part of its ritual will be forbidden to engage in such a ritual even if the victims are consenting adults. Even religious practices which merely expose people to danger have been prohibited. *See, e.g., Hill v. State,* 38 Ala. App. 404, 88 So.2d 880, *cert.denied,* 264 Ala. 697, 88 So.2d 887 (1956); *Harden v. State,* 188 Tenn. 17, 216 S.W.2d 708 (1948). Furthermore, a religious injunction to polygamy in this country has never been a bar to a prosecution for bigamy. *See Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878). In numerous instances courts have required life-saving medical treatment for children in the face of parental objections grounded in sincerely held religious convictions. *See, e.g., Jehovah's Witnesses in Wash. v. King County Hosp., Unit No. 1,* 278 F. Supp. 488 (W.D. Wash. 1967), *aff'd.,* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968); *State v. Perricone,* 371 N.J. 463, 181 A.2d 751, *cert. denied,* 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); *Hoener v. Bertinato,* 67 N.J. Super. 517, 171 A.2d 140 (1961).

Consequently, notwithstanding the strong language of *Yoder,* since that case arose out of an entirely different factual context, this Court holds that sincerely held religious convictions are never a defense to total noncompliance with the compulsory school attendance law. Exemption B in *Code,* 18-8-1 [1951] itself provides a constitutionally sound vehicle for balancing and reconciling all divergent constitutional interests.

## IV

The appellants assert that the standard for qualifying for Exemption B is unconstitutionally vague when it says:

> The instruction in such cases shall be conducted by a person or persons who, in the judgment of the county superintendent and county board of education, are qualified to give instruction in subjects required to be taught in the free elementary schools of the State.

While the appellants characterize this language as "vague," the Court would characterize it as "flexible." Since the Supreme Court in *Yoder, supra,* has enjoined a balancing test upon the states whenever there is a conflict between state education and free exercise of religion, the type of flexible standard established by Exemption B is necessary.[4]

The language "qualified to give instruction in subjects required to be taught in free elementary schools" is sufficiently definite that an arbitrary and capricious refusal by the county superintendent and county board of education to grant approval to qualified instructors can be corrected either by an action for declaratory judgment or an action in mandamus.

---

[4] In defining "religion" in this context or in any other dispute concerning religious freedom as guaranteed by *W. Va. Const.,* Art. III § 15, we would choose to follow the broader definition implied in *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) and *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) rather than the narrow definition recited in *Wisconsin v. Yoder, supra,* in text. These former cases involved the granting of conscientious objector status to persons who based their claims on deeply held ethical or personal as opposed to orthodox religious beliefs. In *Seeger* the Court concluded that a belief was consistent with the "religious training and belief" requirements of the Selective Service Act if it was a "sincere and meaningful belief which occupie[d] in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption. . . ." 380 U.S. at 176, 85 S.Ct. at 859. Consequently we do not find that in order to come under the aegis of the free exercise clause of the State *Constitution* it is necessary that sincerely held convictions emanate from eschatology. It is sufficient if there are sincere parental convictions which form the basis for the moral and ethical aspirations upon which the parents structure their lives. *See Wisconsin v. Yoder,* 406 U.S. 205, 245, 92 S.Ct. 1526, 1548, 32 L.Ed.2d 15 (1972) (Douglas, J., dissenting in part). Such an interpretation is also implicit in this Court's holding in *State v. Everly,* 150 W.Va. 423, 146 S.E.2d 705 (1966). In *Everly,* an ordained minister of the Jehovah's Witnesses was sentenced to serve ten days in jail for refusing to serve on a grand jury. He refused for "personal conscientious objections" while admitting that other members of his congregation were free to serve as jurors if they so wished. We held that his beliefs, though not a part of the orthodoxy of his organized church, were protected by both the United States *Constitution* and the West Virginia *Constitution.* We therefore reversed his conviction.

In *Yoder,* we reiterate for emphasis, the Supreme Court was not confronted by a threat to the *basic literacy* of children living in the State of Wisconsin; rather, they were confronted with an organized community's efforts to integrate their children into traditional agricultural life during the last two years of compulsory school attendance. In the test-case before us we are confronted with a potential challenge to basic literacy. If we reverse the convictions below our holding will imply that parents are not required to solicit the approval of the county board of education for home instruction, thereby freeing parents from supervision concerning curriculum, qualification of instructors, and duration of attendance which supervised, approved and regulated home instruction under Exemption B will guarantee.

V

Since there is no evidence in the record that the county superintendent interpreted the phrase "qualified to give instruction" in Exemption B as requiring a West Virginia teacher's certificate we need not reach that issue. Nonetheless, we do note that the statute requires a *person* who is "qualified to give instruction" and not a correspondence school. Regardless of the quality of prepared instructional material there is no substitute for an educated teacher who is capable of answering questions and guiding inquiring minds into the new and uncontemplated directions to which any well-prepared material should inevitably lead.

Furthermore, as this Court pointed out in *Pauley v. Kelly, supra,* the purpose of education is not limited to the fundamentals of reading, writing, and arithmetic. Implicit in the concept of "persons qualified to give instruction" is an instructor's ability to afford students diverse forms of cultural enrichment ranging from organized athletics, art, music, and literature, to an understanding of the multiple possibilities for careers which this society offers. It is obvious under the strong language of *Yoder, supra,* that a child may be foreclosed from the opportunity of pursuing certain subjects (such as evolution) by virtue of the free exercise clause of the first amendment, but it must be demonstrated that there is an *actual* conflict

between pursuing a *particular* subject and a sincerely held religious tenet.

We find it inconceivable that in the twentieth century the free exercise clause of the first amendment implies that children can lawfully be sequestered on a rural homestead during all of their formative years to be released upon the world only after their opportunities to acquire basic skills have been foreclosed and their capacity to cope with modern society has been so undermined as a to prohibit useful, happy or productive lives.

## VI

When the concurring opinions of Mr. Justice Stewart and Mr. Justice White, the dissenting opinion of Mr. Justice Douglas, and the fact that Mr. Justice Powell and Mr. Justice Rehnquist did not participate in the decision in the *Yoder* case are all taken into account, this Court concludes that *Yoder* did not entirely reject the legitimate interest of the child in being prepared to take advantage of the options which this wealthy and diverse society offers.

As Mr. Justice White said, concurring in *Yoder*:

> This would be a very different case for me if respondents' claim were that their religion forbade their children from attending any school at any time and from complying in any way with the educational standards set by the State. Since the Amish children are permitted to acquire the basic tools of literacy to survive in modern society by attending grades one through eight and since the deviation from the State's compulsory-education law is relatively slight, I conclude that respondents' claim must prevail, largely because "religious freedom—the freedom to believe and to practice strange and, it may be, foreign creeds—has classically been one of the highest values of our society." . . . In the present case, the State is not concerned with the maintenance of an educational system as an end in itself, it is rather attempting to nurture and develop the human potential of its children, whether Amish or non- Amish: to expand their knowledge, broaden their sensibilities, kindle their imagination, foster a spirit of free in-

quiry, and increase their human understanding and tolerance. It is possible that most Amish children will wish to continue living the rural life of their parents, in which case their training at home will adequately equip them for their future role. Others, however, may wish to become nuclear physicists, ballet dancers, computer programmers, or historians, and for these occupations, formal training will be necessary. There is evidence in the record that many children desert the Amish faith when they come of age. A State has a legitimate interest not only in seeking to develop the latent talents of its children but also in seeking to prepare them for the life style that they may later choose, or at least to provide them with an option other than the life they have led in the past. In the circumstances of this case, although the question is close, I am unable to say that the State has demonstrated that Amish children who leave school in the eighth grade will be intellectually stultified or unable to acquire new academic skills later. The statutory minimum school attendance age set by the State is, after all, only 16. 406 U.S. at 238-240, 92 S.Ct. at 1544-45.

While the appellants in the case before us are sincere, dedicated, and competent parents, the principle which they are urging, namely the legitimacy of *ad hoc* non-compliance with our school attendance laws, leads ineluctably to a hideous result. If we were to accept their reasoning, our holding would imply that parents have the right to keep their children in medieval ignorance, quarter them in Dickensian squalor beyond the reach of the ameliorating influence of the social welfare agencies, and so to separate their children from organized society in an environment of indoctrination and deprivation that the children become mindless automatons incapable of coping with life outside of their own families. We hold that the first and fourteenth amendments to the *Constitution of the United States* do not contemplate such a result.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Harrison County is affirmed.

*Affirmed.*