IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2025 Term

_____

No. 24-176

_____

**FILED**

**November 13, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

In re M.B.

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Tera Salango, Judge
Civil Action No. 23-JA-171

AFFIRMED

_____

Submitted: October 22, 2025
Filed: November 13, 2025

Sandra K. Bullman
Bullman and Bullman
Charleston, West Virginia
Guardian ad litem for M.B.

John B. McCuskey
Attorney General
Wyclif Farquharson
Assistant Attorney General
Office of the Attorney General
Charleston, West Virginia
Counsel for Respondent Department of
Human Services

Aimee N. Goddard
Legal Aid of West Virginia
Clarksburg, West Virginia
Counsel for Intervenors A.Y. and B.Y.

John B. McCuskey
Attorney General
Michael R. Williams
Principal Deputy Solicitor General
Office of the Attorney General

Charleston, West Virginia
Counsel for Amicus Curiae State of West
Virginia

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE BUNN concurs and reserves the right to file a separate Opinion.

JUSTICE TRUMP concurs and reserves the right to file a separate Opinion.

JUSTICE EWING concurs and reserves the right to file a separate Opinion.

SENIOR STATUS JUSTICE HUTCHISON concurs and reserves the right to file a separate Opinion.

**SYLLABUS BY THE COURT**

1. "'"'In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively,* 155 W. Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David Allen B. v. Sommerville,* 194 W.Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In the Interest of Kaitlyn P.,* 225 W. Va. 123, 690 S.E.2d 131 (2010).'" Syl. Pt. 3, *In re Timber M.*, 231 W. Va. 44, 743 S.E.2d 352 (2013).

WOOTON, Chief Justice:

The petitioner ("the petitioner") is the guardian ad litem of M.B.,[1] a two-year-old child who has been in the continuous care of the intervenor foster parents A.Y. ("the foster father") and B.Y. ("the foster mother") (collectively "the foster parents") since shortly after his birth. The petitioner appeals from the February 29, 2024, order entered by the Circuit Court of Kanawha County, West Virginia, denying her motion to remove M.B. from the foster parents' home, arguing that because his placement in the home cannot lead to permanency, i.e., adoption, it would be in his best interest to be placed with another family that can offer him permanency. The petitioner offers several bases for her contention that the foster placement here cannot lead to permanent placement. First, the petitioner contends that the foster parents, being members of an Old Order Amish community, would restrict M.B.'s formal education to grades one through eight and thus deprive him of his constitutional right to a thorough and efficient education. *See* W. Va. Const. art. XII, § 1.[2] The petitioner also argues that remaining with Amish foster parents would not be in M.B.'s best interests because he would not have regular pediatric checkups, would not be vaccinated, would not be exposed to technology, and would not learn to drive. Finally, the petitioner suggests that M.B.'s adoption into the Amish community is problematic, at best,

---

[1] Because this case involves minors and sensitive matters, we follow our longstanding practice of using initials to refer to the children and the pertinent parties. *See* W. Va. R. App. P. 40(e).

[2] West Virginia Constitution article XII, section 1 provides that "[t]he Legislature shall provide, by general law, for a thorough and efficient system of free schools."

in that the community might not welcome a biracial child. *See infra* (discussing all of these matters in detail).

The respondent, the West Virginia Department of Human Services,[3] and the foster parents, argue that to the contrary, it is in M.B.'s best interests to remain in what all parties acknowledge to be a loving home with the foster parents and his three siblings, who are part of the family unit.

After careful review of the parties' and the intervenors' briefs and oral arguments,[4] the appendix record, and the applicable law, we affirm the circuit court's denial of the petitioner's motion to remove M.B. from the foster parents' home.

## I.    Facts and Procedural Background

---

[3] Pursuant to West Virginia Code section 5F-2-1a (2024), the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the involved agency is now the Department of Human Services ("DHS").

[4] We have also considered the "Brief of Amicus Curiae State of West Virginia in Support of Affirmance" and oral argument made by the Principal Deputy Solicitor General, and thank the Attorney General for apprising this Court of the State's views on the issues presented in this case.

We begin with necessary background. As noted *supra*, the foster parents are members of an Old Order Amish community ("the community"). The history of Old Order Amish communities, including their longstanding opposition to formal education past the eighth grade, was described in detail in the case of *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (plurality opinion), where the United States Supreme Court held that a state could not prosecute Amish parents for their refusal to comply with compulsory education laws that mandated formal education of all children up until a statutorily determined age, because the parents' refusal was based upon their deeply held religious beliefs.

> The history of the Amish sect . . . [begins] with the Swiss Anabaptists of the 16th century who rejected institutionalized churches and sought to return to the early, simple, Christian life de-emphasizing material success, rejecting the competitive spirit, and seeking to insulate themselves from the modern world. As a result of their common heritage, Old Order Amish communities today are characterized by a fundamental belief that salvation requires life in a church community separate and apart from the world and worldly influence. This concept of life aloof from the world and its values is central to their faith.
>
> A related feature of Old Order Amish communities is their devotion to a life in harmony with nature and the soil, as exemplified by the simple life of the early Christian era that continued in America during much of our early national life. Amish beliefs require members of the community to make their living by farming or closely related activities. Broadly speaking, the Old Order Amish religion pervades and determines the entire mode of life of its adherents.

*Id.* at 209-10. Further,

> Amish objection to formal education beyond the eighth grade is firmly grounded in these central religious concepts. They object to high school, and higher education generally,

3

because the values they teach are in marked variance with Amish values and the Amish way of life; they view secondary school education as an impermissible exposure of their children to a 'worldly' influence in conflict with their beliefs. The high school tends to emphasize intellectual and scientific accomplishments, self-distinction, competitiveness, worldly success, and social life with other students. Amish society emphasizes informal learning-through-doing; a life of 'goodness,' rather than a life of intellect; wisdom, rather than technical knowledge, community welfare, rather than competition; and separation from, rather than integration with, contemporary worldly society.

Formal high school education beyond the eighth grade is contrary to Amish beliefs, not only because it places Amish children in an environment hostile to Amish beliefs with increasing emphasis on competition in class work and sports and with pressure to conform to the styles, manners, and ways of the peer group, but also because it takes them away from their community, physically and emotionally, during the crucial and formative adolescent period of life.

*Id*. at 210-11.

The evidence of record in this case indicates that members of the foster parents' community send their children to an Amish-run school for eight years of formal education, usually beginning when the children are six and ending when they are thirteen or fourteen, following which the children learn particularized skills and/or trades which will enable them to earn a living when they reach adulthood. When questioned about this, the foster father testified that he and the foster mother would not permit M.B. to attend school past eighth grade, even if he wanted to do so, although M.B. would be free to make his own decision about continuing formal education after turning eighteen years of age.

In 2020, after an abuse and neglect proceeding was instituted in Greenbrier County, West Virginia, against A.H. and J.B. ("the biological parents"), their three very young daughters were placed in the foster parents' home. The foster parents ultimately became the girls' legal guardians and, following the termination of the biological mother's rights, adopted them.[5] There were no objections lodged to the foster parents' guardianship or adoption of the three girls, as a court-appointed special commissioner reported that they were "well-behaved, beautifully dressed, clean, and obviously very attached to [the foster parents]."

On May 16, 2023, the girls' brother, M.B., was born and was immediately placed with the foster parents, where he remains to this day. On June 1, 2023, an abuse and neglect proceeding was instituted in Kanawha County, West Virginia, against the biological parents, which ultimately resulted in the termination of their parental rights to M.B. in December, 2023.

On September 12, 2023, the petitioner filed a Motion to Change Placement which was primarily grounded on her objection to the foster mother's attempt to induce

---

[5] Legal guardianship of the three children was granted at a time when their father's parental rights had been terminated and the mother's custodial rights, but not her parental rights, had been terminated.

lactation in order to breastfeed the baby.[6] The motion also alleged that it was not in M.B.'s best interests to remain in an Amish home because (1) the child is not Amish, (2) the only mode of transportation for the foster parents is a horse and buggy, (3) the foster parents' Amish community requires children to "attend a [c]ommunity school which only lasts 8 years ending when the children are approximately 13[,]" and (4) the community does not have a medical doctor and "it is not [sic] believed that [the foster mother] will not continue with a medical doctor for [M.B.'s] care if he is eventually adopted by the family." On September 21, 2023, the circuit court held a hearing on the motion and denied it on a temporary basis, ordering the foster mother to cease attempting to breastfeed, appointing a special commissioner to investigate the question of permanent placement of the baby with the foster parents, and requesting that DHS and the petitioner file briefs.

In its brief, the DHS requested that M.B. be permitted to remain in the foster placement and that the foster parents be considered for permanent placement. In her brief, the petitioner requested that M.B. be removed from the foster placement for the reasons

---

[6] The question of whether there is any legal impediment to a foster mother's attempt to induce lactation in order to breastfeed a foster child is not before this Court, as the circuit court ordered the foster mother to stop her efforts to induce lactation and she complied with the court's order. The petitioner claims that the foster mother was deceptive about whether she had discussed this issue with a physician, but the court made no factual findings on this point and we find it unnecessary to discuss the issue because it is wholly irrelevant to the issues on appeal.

discussed *supra*. The special commissioner also recommended that the baby be removed, notwithstanding her very positive assessment of the placement:

> The home was comfortable, pleasantly furnished, and spotless. The girls were well-behaved, beautifully dressed, clean, and obviously very attached to their parents. [M.B.] appeared very clean and content. There was plenty of food, including lots of home-canned fruits and vegetables. The foster mother unilaterally chose to induce lactation in order to breast-feed [M.B.] Her decision was entirely inappropriate and caused considerable consternation. She complied with instruction to cease this practice. [M.B.] was observed drinking formula from a bottle. The formula can was on the counter – Similac organic. The family's personal interactions revealed a warm, caring, close, and respectful bond. They were very welcoming during the visit.
>
> If [M.B.] remains with this family permanently, he will grow up in a loving and spiritual home with his three biological sisters, he will be part of a large extended family, he will learn a trade, he will learn valuable home and work skills, he will learn to be a productive and independent citizen, he will receive a basic education through eighth grade, he will be able to support himself and a family, and he will be part of a close and mutually-beneficial spiritual community.

Nonetheless, the special commissioner concluded that

> [i]f [M.B.] remains with this family permanently, he will likely not receive an education past the eighth grade, he will not be vaccinated, he will not receive standard medical care, and he will be subject to rigid gender and sexuality roles. [M.B.] is a bi-racial child in a very homogenous white, German-ancestry society, which, outside of his immediate family, may not accept him fully as a member of the community. He will not be exposed to technology, which certainly may be beneficial in some regards, but which would serve to isolate him from the larger world and challenge his outside employment opportunities. When he turns eighteen, if

7

he chooses to leave the community, his options would be limited.

Finally, the special commissioner noted that "[t]here is no appetite from anyone involved in their case, including the undersigned, to remove [M.B.'s three sisters] from their loving family and place them elsewhere at this late date, even if that were legally possible."[7] Thus, she recommended, inter alia, that "[M.B.] shall be separated from all other siblings, known and unknown, for purposes of his permanent placement."

On January 12, 2024, the foster parents filed a motion to intervene. Thereafter, on January 31, 2024, the circuit court held a hearing on the petitioner's motion to change placement and the foster parents' motion to intervene. The court denied the motion to intervene,[8] but permitted the foster parents' counsel to participate in the hearing and present evidence. At the hearing, the only witness called to testify was the foster father. With specific relevance to this appeal, the foster father testified that M.B. would attend an Amish school for eight years, i.e., grades one through eight, after which he would receive vocational training to learn skills that would enable him to earn a living and fully participate

---

[7] The special commissioner alleged that the initial placement of the girls with the foster parents occurred because the presiding judge was "under the erroneous impression that the [foster parents] were relatives[.]" There are no court documents in the appendix record to support this statement, and in any event it not relevant to the issues presented in this case.

[8] The foster parents did not appeal from the denial of their motion to intervene in the underlying abuse and neglect case; however, as noted *supra* this Court granted their motion to intervene in the instant appeal.

in community life; that the foster parents would not permit M.B. to attend high school, even if the boy expressed a desire to further his education, although he would be free to make his own decision after he turned eighteen; that the community did not have a physician, but that the foster parents would take their children for medical care when it was necessary (the foster father specifically mentioned, as examples, cuts that required wound care, broken bones, fevers, and illnesses that worsened over time); that members of the community did not routinely vaccinate their children but that the foster parents would consider vaccinating M.B. and his sisters if the circumstances seemed to warrant it; and that the community had been wholly accepting of M.B. and his sisters notwithstanding the fact that the children were biracial. Finally, the foster father acknowledged that he and the foster mother had indicated a preference for White children on their application to be foster parents but explained that this was done out of concern for the possibility – a possibility that never materialized – that the community might not be accepting of a non-White child. Further, the foster father testified that if the community did not accept M.B. and/or his sisters on account of their race, the foster parents would move to another, welcoming, community.

On February 29, 2024, the circuit court entered an order denying the foster parents' motion to intervene and denying the petitioner's motion to remove M.B. from the foster parents' home. With respect to the latter, the court concluded that it "does not believe that it can discriminate against this family due to its religion and lifestyle[,]" and that "the

9

most important thing to consider is the best interests of the child pursuant to West Virginia Code 48-9-102." The court then made specific findings: "this home will: a. Give the child a stable loving home[;] b. The child will be placed with his biological siblings[;] [and] c. That the [c]ourt doesn't find that this child will have limitations in this family as he will receive a basic education and will further learn a trade." The court ordered that M.B. be staffed for adoption but subsequently stayed that portion of its order pending disposition of this appeal.

## II. Standard of Review

We have held that

[t]he standard of review that governs appeals in abuse and neglect cases is set forth in Syllabus Point 1 of *In the Interest of Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996). It states:

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case

10

differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

*In re Hunter H.*, 227 W. Va. 699, 703, 715 S.E.2d 397, 401 (2011) (per curiam). With respect to the petitioner's arguments concerning the Foster Child Bill of Rights ("the FCBR")[9], we apply the de novo standard of review to our examination of West Virginia Code § 49-2-126. "As we have held, '[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.'" *In re G.G.*, 249 W. Va. 496, 501, 896 S.E.2d 662, 667 (2023) (citing Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W. Va. 138, 459 S.E.2d 415 (1995)).

Finally, with respect to proceedings both in the circuit courts and in this Court, we reiterate our longstanding rule that

> """"[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. pt. 1, *State ex rel. Cash v. Lively,* 155 W. Va. 801, 187 S.E.2d 601 (1972).' Syllabus Point 4, *State ex rel. David Allen B. v. Sommerville,* 194 W. Va. 86, 459 S.E.2d 363 (1995)." Syl. Pt. 2, *In the Interest of Kaitlyn P.,* 225 W. Va. 123, 690 S.E.2d 131 (2010).'" Syl. Pt. 3, *In re Timber M.*, 231 W. Va. 44, 743 S.E.2d 352 (2013).

## III.    Discussion

---

[9] *See* W. Va. Code § 49-2-126 (2024) (referred to as the Foster Child Bill of Rights).

### A. M.B.'s Right to Formal Education Past the Eighth Grade

We begin by recognizing that this issue is unique: whereas the relevant precedents guiding our consideration all involve the right of parents to the free exercise of their religion versus the interest of a state in establishing and enforcing educational standards, this case involves the right of a *child* to receive an education that meets this State's educational standards. In this regard, the United States Supreme Court acknowledged this distinction in *Yoder*, noting that

> [t]he dissent argues that a child who expresses a desire to attend public high school in conflict with the wishes of his parents should not be prevented from doing so. There is no reason for the Court to consider that point since it is not an issue in the case. *The children are not parties to this litigation.* The State has at no point tried this case on the theory that respondents were preventing their children from attending school against their expressed desires[.]

406 U.S. at 231 (emphasis added) (footnote omitted). In contrast, here the petitioner, M.B.'s guardian ad litem, acting on his behalf, is a party to this appeal and advocates for what she claims to be his constitutional and statutory right to a high school education.

We need not address the petitioner's constitutional claim because it fails to meet the requirements of Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure, which requires that "[t]he argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issue[] . . . [was] presented to the lower tribunal." *See, e.g.*, *Westfield Grp. Ins. v. Ohio Build & Remodel,*

12

*LLC,* No. 18-1142, 2020 WL 1236918, at \*2 (W. Va. Mar. 13, 2020) ("in an Administrative Order entered December 10, 2012, *Re: Filings That Do Not Comply With the Rules of Appellate Procedure*, this Court specifically noted that '[b]riefs that lack citation of authority [or] fail to structure an argument applying applicable law' are not in compliance with this Court's rules. Further, '[b]riefs with arguments that do not contain a citation to legal authority to support the argument presented . . . as required by rule 10(c)(7)' are not in compliance with this Court's rules. *Id.* 'A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . . Judges are not like pigs, hunting for truffles buried in briefs.' *State v. Kaufman*, 227 W. Va. 537, 555 n.39, 711 S.E.2d 607, 625 n.39 (2011) (citation omitted). Because petitioner's brief with regard to this lone assignment of error is inadequate and fails to comply with Rule 10(c)(7), we decline to address this argument on appeal.").

Here, the constitutional argument in the petitioner's brief consists of two sentences that could most charitably be deemed conclusory: "The West Virginia Constitution guarantees a right to an education to West Virginia children. West Virginia Constitution Article 12 Section One creates a fundamental state constitutional right to an education for the children of this state." We easily conclude that these thirty-six words are insufficient to preserve the complex, many-layered argument that the petitioner attempts to raise: whether high school is a necessary component of a "thorough and efficient" education and, if so, whether a child's right to that education outweighs the Amish parents'

right to the free exercise of their religious beliefs, which beliefs preclude formal schooling after eight years. And in any event, this Court has indicated, albeit in dicta, that an Amish education is sufficient to meet the standard of article XII, section 1 of the West Virginia Constitution because of the unique, and longstanding, nature of the Amish community, "which [is] defined not only through common membership in a religious sect, but also geographically and culturally." *State v. Riddle*, 168 W. Va. 429, 439, 285 S.E.2d 359, 365 (1981).

Thus, we turn to the petitioner's statutory claims, which first requires us to examine the FCBR. *See* W. Va. Code § 49-2-126(a).[10] The FCBR provides:

> (a) Foster children and children in a kinship placement are active and participating members of the child welfare system and have the following rights:
> (1) The right to live in a safe and healthy environment, and the least restrictive environment possible;
> (2) The right to be free from physical, sexual, or psychological abuse or exploitation including being free from unwarranted physical restraint and isolation.
> (3) The right to receive adequate and healthy food, appropriate and seasonally necessary clothing, and an appropriate travel bag;
> (4) The right to receive medical, dental, and vision care, mental health services, and substance use treatment services, as needed;
> (5) The right to be placed in a kinship placement, when such placement meets the objectives set forth in this article;

---

[10] West Virginia Code section 49-2-126(b) is irrelevant to any of the issues in this case.

(6) The right, when placed with a foster of kinship family, to be matched as closely as possible with a family meeting the child's needs, including, when possible, the ability to remain with siblings;

(7) The right, as appropriate to the child's age and development, to be informed on any medication or chemical substance to be administered to the child;

(8) The right to communicate privately, with caseworkers, guardians ad litem, attorneys, Court Appointed Special Advocates (CASA), the prosecuting attorney, and probation officers;

(9) The right to have and maintain contact with siblings as may be reasonably accommodated, unless prohibited by court order, the case plan, or other extenuating circumstances;

(10) The right to contact the department or the foster care ombudsman, regarding violations of rights, to speak to representatives of these offices confidentially, and to be free from threats, retaliation, or punishment for making complaints;

(11) The right to maintain contact with all previous caregivers and other important adults in his or her life, if desired, unless prohibited by court order or determined by the parent, according to the reasonable and prudent parent standard, not to be in the best interests of the child;

(12) The right to participate in religious services and religious activities of his or her choice to the extent possible;

(13) The right to attend school, and, consistent with the finances and schedule of the foster or kinship family, to participate in extracurricular, cultural, and personal enrichment activities, as appropriate to the child's age and developmental level;

(14) The right to work and develop job skills in a way that is consistent with the child's age and developmental level;

(15) The right to attend Independent Living Program classes and activities if the child meets the age requirements;

(16) The right to attend court hearings and speak directly to the judge, in the court's discretion;

(17) The right not to be subjected to discrimination or harassment;

(18) The right to have access to information regarding available educational options;

(19) The right to receive a copy of, and receive an explanation of, the rights set forth in this section from the child's guardian ad litem, caseworker, and attorney;

(20) The right to receive care consistent with the reasonable and prudent foster parent standard; and

(21) The right to meet with the child's department case worker no less frequently than every 30 days.

*Id.*

Focusing on subsections (a)(13) and (18) of the FCBR, the petitioner argues that M.B.'s continued placement with Amish foster parents will deprive him of his statutory right to attend school – specifically, high school – and his right of access to information about available educational options, thus mandating his removal from the foster parents' home. *See id.* §§ 49-2-126(a)(13), (18). We disagree. The petitioner appears to view each and every provision of the FCBR as mandatory, i.e., one strike and you're out. However, our precedents make clear that with the exception of subsections (a)(1), (2), and (3),[11] the provisions of the FCBR constitute an interwoven set of factors to be considered and

---

[11] It is readily apparent that violations of the rights enumerated in subsections (a)(1), (2), and (3) would mandate removal of a child from his or her placement. We cannot envision a circumstance wherein a circuit court would permit a child to remain in a foster home where the evidence showed that the child was living in an unsafe or unhealthy environment, was being physically, sexually, or emotionally abused, or was not being properly nourished and/or clothed.

weighed in making a determination of whether a foster child's placement is in his or her best interests.

In *In re R.S.*, 244 W. Va. 564, 855 S.E.2d 355 (2021), a case of first impression, the issue before this Court was whether the circuit court had erred in concluding that "new legislation, including W. Va. Code § 49-2-126(a)(6) (2020), mandated that R.S. be placed in the same home as his siblings. [The circuit court] determined that 'there is nothing in this statute that directs that the Court do a balancing test or a best interest [of the child] analysis.'" 244 W. Va. at 567, 855 S.E.2d at 358. This Court reversed, finding that "[f]irst, W. Va. Code § 49-2-126(a)(6) does not include any mandatory language, such as the word 'shall' or 'must.'" 244 W. Va. at 571, 855 S.E.2d at 362. We explained that

> [i]nstead of using mandatory terms like "shall" or "must," W. Va. Code § 49-2-126(a)(6) directs that a child's ability to remain with siblings is to be *included* as a factor when making a permanent placement ruling. The statute does not restrict or limit a court to *only* consider whether a child has the ability to remain with siblings.

244 W. Va. at 571, 855 S.E.2d at 362. We encountered a similar issue in *In re G.G.*, where the circuit court rejected the petition of the child's aunt and uncle for custody of the child, instead awarding custody to foster parents with whom she had been placed for nine months while the underlying abuse and neglect case against her biological parents proceeded. 249 W. Va. at 496, 896 S.E.2d at 662. On appeal, the aunt and uncle argued that section 49-2-

126(a)(5) of the FCBR created a kinship preference and that the court thus erred in awarding custody to the foster parents, who were not related to the child by blood. Once again, this Court reversed, holding that

> "'in a contest involving the custody of an infant where there is no biological parent involved, the best interests of the child are the polar star by which the discretion of the court will be guided.' *McCoy* [*State ex rel. Treadway v. McCoy,* 189 W. Va. 210, 429 S.E.2d 492 (1993)], 189 W. Va. at 210, 429 S.E.2d at 492, syl. pt. 1, in part. Here, the circuit court determined that it is in G.G.'s best interests to remain in her current placement with the [foster parents], and we have found no basis to set aside that determination."

*In re G.G.*, 249 W. Va. at 507, 896 S.E.2d at 673; *see also In re M.M.* 251 W. Va. 74, __, 909 S.E.2d 109, 116-17 (2024) (discussing the holdings of *In re R.S.* and *In re G.G.* with approval and reiterating that "West Virginia Code § 49-2-126(a)(5) (2020) requires a circuit court to conduct a best-interest-of-the-child analysis before removing a foster child from his or her foster family home and placing that child in a kinship placement.").

We believe that the rationale of these cases is sound and that such rationale supports our conclusion today that the provisions of West Virginia Code sections 49-2-126(a)(13) & (18), either singly or together, cannot be read to bar Amish parents from fostering or adopting children. Indeed, our precedents lead ineluctably to the conclusion that West Virginia Code section 49-2-126(a) (2020), the Foster Child Bill of Rights, requires a circuit court to conduct a best-interest-of-the-child analysis before removing a

foster child from his or her current placement based upon an allegation that the child is being denied one or more of the rights enumerated in subsections (4) through (21) of the statute. In making such analysis, all relevant statutory provisions may be considered and weighed by the court in light of the facts and circumstances of the case. Here, a review of the record indicates that this is exactly what the court did, after reviewing the parties' briefs and arguments, the evidence, and the testimony of the foster father. The court's findings of fact and conclusions of law are amply supported by the evidence of record, and we therefore affirm the court's denial of the petitioner's motion to remove M.B. from the foster parents' home on the ground that he will be denied an education or access to information about educational opportunities.


### B. M.B.'s Right to Medical Care and Vaccinations

The petitioner next alleges that pursuant to the FCBR, West Virginia Code section 49-2-126(a)(4), M.B. has a right to medical care – care that he will not receive because the foster father testified that the Amish community does not have a doctor, that children are taken to the doctor only in situations where home health remedies are clearly inadequate, and that community members do not routinely vaccinate their children. We reject this claim both on legal and factual grounds.

First, as discussed *supra* in detail, an allegation that the placement of a child will result in a deprivation of a right enumerated in subsections (a)(4) through (21) of the

19

FCBR does not, in and of itself, mandate removal from the placement; rather, the facts and circumstances are to be considered and weighed by the circuit court together with all other facts and circumstances supporting, or not supporting, the placement. Second, the facts of this case simply do not support the petitioner's allegations that M.B. has been or will be denied medical care. The evidence of record shows that the foster parents have scrupulously abided by all of the DHS's requirements, taking M.B. for regular medical checkups, having him vaccinated, taking him to a specialist for treatment and a surgical procedure to correct bilateral hydronephrosis, and giving him all prescribed medications therefor. Further, the undisputed testimony of the foster father was that he and the foster mother would continue to seek medical care for the child when necessary, *see* text *supra*, and would consider additional vaccinations if they had reason to believe that those vaccinations would be efficacious. Third, the petitioner points to no statutes or case law supporting her claim that "medical care," as the term is used in West Virginia Code section 49-2-126(a)(4), mandates regularly scheduled preventative medical checkups for children and/or vaccinations for children who will not be attending public school.

As was the case with the petitioner's claim that placement with the foster parents would result in the denial of M.B.'s right to an education, the circuit court considered and weighed all of the evidence presented and concluded that placement with the foster parents would not result in the denial of M.B.'s right to medical care. Again, the

20

court's findings of fact and conclusions of law are amply supported by the evidence of record, and we therefore will not disturb the court's ruling.

### C. M.B.'s Placement With a White Family

In her final assignment of error, the petitioner argues that the circuit court erred in denying her motion to remove M.B. from the foster parents' home because in their initial application they stated a preference for White children. Additionally, the petitioner claims that the foster parents are "attempting to hide the race of the child from their Amish community," which in turn denies M.B. the right to live in a safe and healthy environment. *See id.* § 49-2-126(a)(1). We address these contentions, albeit briefly, in turn.

In his testimony, the foster father acknowledged that the foster parents had expressed a preference for White children but explained that they did so out of a concern that the Amish community might not accept children of another race, a concern which proved to be wholly unfounded.[12] The foster father further testified that if this ever changed, i.e., if the community became less accepting or welcoming as time went on, the family would move to another community. Finally, notwithstanding any initial hesitation they may have had, the fact is that the foster parents went ahead and welcomed four mixed-

---

[12] The foster father testified that the community had been completely accepting of, and welcoming to, all four of the children.

21

race children into their home, have adopted three of them, and hope to adopt M.B. as well.[13]

We reject any suggestion by the petitioner that the foster parents' initial stated preference for a White child should somehow disqualify them from providing a home for children of other races or ethnicities, or that they in any way have denied M.B. a safe and healthy environment. The evidence in this case is undisputed that the foster parents have provided M.B. and his sisters with what the special commissioner characterized as a "loving and spiritual" home.

Because there is not one scintilla of evidence in the record to support the petitioner's allegation that the foster parents are attempting to hide the fact that M.B. and his sisters are mixed-race children – indeed, the only evidence in the record is to the contrary – we determine that this claim is without merit.

Again, as was the case with the petitioner's claim that placement with the foster parents would result in the denial of M.B.'s right to an education and/or his right to medical care, *see* text *supra*, the circuit court considered and weighed all of the evidence presented and concluded that placement with White foster parents, in a White community,

---

[13] When the circuit court asked the foster father why he and his wife wanted to adopt all of the children, he replied that "we have always loved children and it didn't appear that we were going to have any biological children so *we wanted children that we could pour our life into, something that we could do that with, that would really last into eternity*." (Emphasis added).

would not result in the denial of M.B.'s right to a safe and healthy environment. And again, the court's findings of fact and conclusions of law are amply supported by the evidence of record, and we therefore will not disturb the court's ruling.

## IV. Conclusion

For the foregoing reasons, the February 29, 2024, Order of the Circuit Court of Kanawha County is affirmed, and this case is remanded to that court for further proceedings consistent with this opinion.

Affirmed.